Mary GREEN et al., Plaintiffs-Appellees,

v.

OCCIDENTAL PETROLEUM CORPORA-
TION and Arthur Andersen & Company
et al., Defendants-Appellants.

OCCIDENTAL PETROLEUM CORPORA-
TION and Arthur Andersen &
Company et al., Petitioners,

v.

UNITED STATES DISTRICT COURT
FOR the CENTRAL DISTRICT OF
CALIFORNIA, Respondent,

Mary GREEN et al., Real Parties
in Interest.

Nos. 74–2895, 75–2211.

United States Court of Appeals,
Ninth Circuit.

Aug. 24, 1976.

Philip F. Westbrook, Jr. (argued), of O'Melvany & Myers, Los Angeles, Cal., for defendants-appellants.

David B. Gold, San Francisco, Cal. (argued), Jack Corinblit (argued), both of Corinblit & Shapero, Stuart L. Kadison (argued), of Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., for plaintiffs-appellees.

## OPINION

Before DUNIWAY, KILKENNY and SNEED, Circuit Judges.

PER CURIAM.

Plaintiffs filed several lawsuits, which were transferred to the district court below, against defendant Occidental Petroleum ("Occidental") and other defendants alleging violations of the federal securities laws due to allegedly misleading financial statements and other reports. The district judge certified the case as a class action under Fed.R.Civ.P. 23(b)(1) and (b)(3), and defendants seek to appeal therefrom. Defendants also seek a writ of mandamus. We hold that the defendants may not appeal under 28 U.S.C. § 1291, that mandamus is inappropriate with respect to the district judge's refusal to certify the question under 28 U.S.C. § 1292(b), and that mandamus

does not lie with respect to class certification under rule 23(b)(3). However, we do direct the district judge to vacate the class certification order insofar as that order certified the class under rule 23(b)(1) and remand for further proceedings consistent with this opinion.

## I. *Statements of Facts.*

On March 4, 1971, the Securities and Exchange Commission filed a complaint for injunctive relief in the Southern District of New York against Occidental Petroleum Corporation and Armand Hammer, Chairman of the Board of Directors and Chief Executive Officer. The complaint alleged that since January 1, 1966, Occidental and Hammer had engaged in an unlawful scheme and course of conduct that violated and was continuing to violate Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.-10b–5, promulgated thereunder. The specific allegations of the complaint were limited to particular matters in which press releases or reports to shareholders, or both, were issued on or after July 31, 1969. The

transactions and accounting treatments [1] challenged by the SEC allegedly caused a material change in Occidental's reported profits for the quarters June 30, 1969 through June 30, 1970, inclusive.

Subsequent thereto, numerous private civil actions were filed in federal and state courts, based upon the allegations of the SEC complaint. The twenty-two actions consolidated in the district court below were originally filed in the courts of some six different federal districts. All cases pending in other districts were transferred to the district court under orders pursuant to 28 U.S.C. § 1404(a). As the district judge found:

> The gravamen of each complaint appears to be that the principal defendants violated Section 10(b) of the 1934 Act by utilizing improper accounting practices and issuing press releases and quarterly reports to shareholders in which the profits of Occidental were overstated, or that other misleading information was given, with the result that the market price of Occidental securities was artificially inflated. Plaintiffs alleged that persons

---

1. "Specifically, the SEC alleged that Occidental had not properly disclosed or accounted for the following transactions or events:

 (i) a sale by Island Creek Coal Company, an Occidental subsidiary, of an interest in certain coal leases which resulted in the inclusion of $6,393,000 in the profits reported for the quarter ending June 30, 1969 (an amount equal to 13.3% of Occidental's reported profits for that quarter);

 (ii) accounting adjustments and changes in accounting procedures made at Hooker Chemical Corporation, an Occidental subsidiary, and at Occidental's European complex, which allegedly resulted in the inclusion of $14,042,000 in the profit reported for the quarter ending September 30, 1969 (an amount equal to 28.6% of that quarter's reported profits);

 (iii) the sale by Island Creek of an interest in certain coal leases which resulted in the inclusion of $3,983,000 in the profits reported for the quarter ending December 31, 1969 (an amount equal to 11.5% of that quarter's reported profits);

 (iv) the sale by Island Creek of an additional interest in coal leases at a profit of $2,643,000; the sale by Occidental Petroleum Land and Development Corporation ('OPLAD'), an Occidental subsidiary, of two

parcels of real estate in two separate transactions at a total profit of some $4,245,000; and the recording of income attributable to a contract between Oxy-Libya, an Occidental subsidiary, and A.G.I.P., S.p.A., an Italian oil company, in the amount of $5,000,000. These various transactions and events allegedly resulted in the inclusion of a total of $11,888,000 in the profits reported for the quarter ending March 31, 1970 (an amount equal to 28.1% of that quarter's reported profits);

 (v) the sale by Island Creek of an additional interest in certain coal leases for a profit of some $1,775,000, and the sale by OPLAD of two parcels of land in two separate transactions for a profit of $2,985,625 and $2,087,-686, respectively, all of which resulted in the inclusion of some $6,848,311 in Occidental's profits for the quarter ending June 30, 1970 (an amount equal to 15.6% of that quarter's reported profits).
The SEC complaint also alleged that a press release issued in May of 1970 failed to disclose anticipated decreases in Libyan oil production, overstated the projections for Island Creek's 1970 coal production, and projected an increase in total earnings for 1970 without adequate supporting information or anticipated sources of income."

**1338**

who were parties to transactions in Occidental securities during the approximate five-and-one-half-year period specified in the SEC complaint and who relied on the information contained in the press releases and quarterly reports, were damaged. With the exception of the plaintiffs in *Weinberger, et al. v. Occidental Petroleum Corporation, et al.*, 71–1841–RJK, each plaintiff seeks to recover damages incurred in connection with transactions he entered into in reliance on false or misleading information. *Memorandum of Decision and Order Certifying Class*, June 28, 1974.

After extensive briefing, on June 28, 1974, the district judge entered an order certifying a class consisting of all purchasers of Occidental common stock between the dates of July 31, 1969 and March 5, 1971. The class was certified under subsections (b)(1) and (b)(3) of Fed.R.Civ.P. 23. The district judge also refused to certify the ruling on the class certification for appeal under 28 U.S.C. § 1292(b).

II. *Jurisdictional Posture.*

■ At the outset, some comments upon the jurisdictional posture of the case are necessary. In this circuit, class certification is not normally appealable as a final order under 28 U.S.C. § 1291. *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975). Section 1292(b) of Title 28, United States Code, on the other hand, provides a method for

appellate review of nonfinal orders in civil actions.[2] However, Section 1292(b) requires that the district judge be "of the opinion" that the criteria for section 1292(b) appeal are met, and vests the Court of Appeals with discretion to permit the appeal. *See D'Ippolito v. Cities Service Co.*, 374 F.2d 643 (2nd Cir. 1967). Concurrence of both the district court and the appellate court is necessary and we are without power to assume unilaterally an appeal under section 1292(b). *See United States v. 687.30 Acres of Land*, 451 F.2d 667 (8th Cir. 1971). Nor is mandamus to direct the district judge to exercise his discretion to certify the question an appropriate remedy. *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1344 (2nd Cir. 1972) (Friendly, J.); *D'Ippolito v. Cities Service Co., supra.*

■ What remains is the defendant's petition for mandamus regarding the underlying question of the class certification.[3] The issuance of the writ is within our power under the All Writs Statute, 28 U.S.C. § 1651,[4] particularly since we could later entertain appeals on these issues. *La Buy v. Howes Leather Co.*, 352 U.S. 249, 255, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). The granting or denying of the writ rests in our sound discretion. *Id.*

■ We recognize that the issuance of this writ should be limited to exceptional circumstances, and share the Second Cir-

2. "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order."

3. Our reluctance to mandamus the district judge to certify the question under section

1292(b), given his statutory discretion to refuse to do so, does not divest us of the power to mandamus the underlying issue. *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1344; *see* 9 Moore, Federal Practice, § 110.22[5] at 267.

4. The All Writs Statute of the Judicial Code of 1948, 28 U.S.C. § 1651, reads:

"§ 1651. Writs

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction."

cuit's view that orders granting class certification are the proper subject for mandamus in only the most extraordinary circumstances. *General Motors Corp. v. City of New York*, 501 F.2d 639, 648 (2nd Cir. 1974). However, we also note the utility of mandamus as a tool to supervise the proper judicial administration in the district courts. *See La Buy v. Howes Leather Co., supra*, 352 U.S. at 259–60, 77 S.Ct. 309, 1 L.Ed.2d 290; *Schlagenhauf v. Holder*, 379 U.S. 104, 110–11, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). *See also* 9 Moore, Federal Practice § 110.28 at 312–13.

For reasons discussed below, we issue the writ with respect to class certification under rule 23(b)(1). *See McDonnell Douglas Corp. v. United States Dist. Ct.*, 523 F.2d 1083 (9th Cir. 1975). With respect to the rule 23(b)(3) certification, after balancing various factors,[5] we conclude not to issue the writ.

**5.** *See Pacific Car and Foundry Co. v. Pence*, 403 F.2d 949, 953 (9th Cir. 1968).

**6.** Rule 23(a) provides:
 (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**7.** Rule 23(b) provides:
 (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 (1) the prosecution of separate actions by or against individual members of the class would create a risk of
 (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
 (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
 (2) the party opposing the class has acted or refused to act on grounds generally appli-

To reach these conclusions, it was necessary to analyze several 10b–5 issues as they relate to rule 23(b)(3). We believe a description of the road we traveled will be useful to the furtherance of this litigation in an expeditious and just manner. The reasons for this belief will become clear as our description unfolds.

### III. *Class Certification Under Rule 23(b)(1).*

In order for an action to be maintained as a class action under Fed.R.Civ.P. 23, the four requirements of rule 23(a)[6] must be met, as well as the requirements of at least one of the subdivisions of rule 23(b). However, certification under 23(b)(3) does not render a certification under 23(b)(1) immaterial and of no consequence. Independent significance attaches to certification under (b)(1).[7] Notice must be given only in the (b)(3) case, and members of a (b)(3) class, but not of a (b)(1) class, may choose to opt out and not be bound by the judgment.[8]

cable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**8.** Rule 23(c)(2) and (c)(3) provides:
 (2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

In cases where both (b)(1) and (b)(3) apply, (b)(1) is held to govern to avoid the multiplicity of suits. *See, e. g., Mungin v. Florida E. Coast Ry.*, 318 F.Supp. 720, 730 (M.D. Fla.1970), *aff'd per curiam*, 441 F.2d 728 (5th Cir. 1971); 7A Wright & Miller, Federal Practice and Procedure, § 1771 at 7–8 and cases cited at Supp. (1976) at 1.

 The instant case is an action for damages. In such cases ordinarily there is neither the risk under rule 23(b)(1)(A) of "inconsistent or varying adjudications" which would "establish incompatible standards of conduct for the party opposing the class," nor of adjudications impairing the

> (3) The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

9. It is conceivable of course, that the claims of named plaintiffs would be so large that if the action were to proceed as an individual action the decision "would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Fed.R.Civ.P. 23(b)(1)(B). This would be the case where the claims of all plaintiffs exceeded the assets of the defendant and hence to allow any group of individuals to be fully compensated would impair the rights of those not in court. *See* 3B Moore's Federal Practice ¶ 23.35[2] (1975). This action does not present this problem.

10. Our discussion in *LaMar* is relevant herein.
> Rule 23(b)(1)(A) authorizes class actions to eliminate the possibility of adjudications in which the defendant will be required to follow inconsistent courses of continuing conduct. This danger exists in those situations in which the defendant by reason of the legal relations involved cannot as a practical matter pursue two different courses of conduct. The Advisory Committee's Note makes this clear in discussing Rule 23(b)(1)(A) by its reference to actions to declare bond issues invalid, to fix the rights and duties of a riparian owner, and to determine a landowner's rights and duties respecting a claimed nuisance.

rights of class members to protect their interests under (b)(1)(B) of Rule 23.[9] No circumstances exist here that render these principles inapposite. These conclusions are supported by *LaMar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973)[10] as well as *McDonnell Douglas Corp. v. United States Dist. Ct.*, 523 F.2d 1083 (9th Cir. 1975). Certification under Rule 23(b)(1), therefore, was improper. Correction can be achieved through mandamus. *Id.* Judicial efficiency requires that we order the district court to vacate the (b)(1) certification so that erroneous notice and opt-out procedures are not employed.

> Infrequently, if ever, will this be the case when the action is for money damages. Certainly the defendants in these proceedings can continue the conduct of which the plaintiffs complain even if the plaintiffs are successful, as the plaintiff in *LaMar* has been, in their individual actions. Their success by its terms does not fix the rights and duties owed by the defendants to others as, for example, would a declaration of the invalidity of the bond issue. We conclude therefore, that Rule 23(b)(1)(A) is inapplicable to class actions which the plaintiffs in these proceedings seek to initiate.
> Nor do we believe that Rule 23(b)(1)(B) is applicable. The focus of it is upon the effect of an action on behalf of an individual on the interests of those who have rights similar to those of the individual bringing suit, rather than on the danger of imposing incompatible standards of conduct on the defendant. If the individual action inescapably will alter the substance of the rights of others having similar claims, as would an action attacking the reorganization of a fraternal benefit society, the situation falls within Rule 23(b)(1)(B).
> In the cases before us the success or failure of the plaintiffs in their individual actions will not inescapably alter the rights of others similarly situated. Their claims are left untouched by separate actions. Neither the *stare decisis* consequences of an individual action nor the possibility of false reliance upon the improper initiation of a class action can supply either the practical disposition of the rights of the class, or the substantial impairment of those rights, at least one of which is required by Rule 23(b)(1)(B). To permit them to do so would make the invocation of Rule 23(b)(1)(B) unchallengeable. There is no indication in the Advisory Committee's Note that any such "bootstrap" effect was intended. 489 F.2d at 466–67 (footnotes omitted).

## IV. *Class Certification Under Rule 23(b)(3).*

After a thorough review of the opinion of the district judge, it is apparent to us that he analyzed the allegations of the complaint and the other material before him which we believe are sufficient to form a reasonable judgment on each requirement, contemplated the type of proof necessary to establish those allegations, determined to the best of his ability the course the litigation would follow, and then decided that the requirements were met at that time. His certification under Rule 23(b)(3) is not subject to attack by way of a writ of mandamus. *Blackie v. Barrack*, 524 F.2d 891, 900–01 (9th Cir. 1975).

## V. *Conclusion.*

Appeal dismissed. Petition for writ of mandamus denied on district court's refusal to certify the question under 28 U.S.C. § 1292(b), and also denied with respect to the allowance of class certification under Rule 23(b)(3), Fed.R.Civ.P. The writ is granted on the class certification under Rule 23(b)(1).

SNEED, Circuit Judge (concurring in part and concurring in the Result in Part).

I agree with parts I, II, and III of the Court's opinion. I find the question of class certification under Rule 23(b)(3), covered in part IV of the Court's opinion, to be more complicated and a closer question than do my brothers. Section IV of the Court's opinion is apparently based upon an assumption that there could not have been an abuse of discretion on the state of this record and hence no guidance is needed by the district court. I disagree.

As I view it, the district court abused its discretion if the Rule 23(b)(3) certification was based on the assumption that the rescissory measure of damages would be the proper measure. To employ such a measure improperly would alter the nature of the substantive rights of the defendants in this case in order to facilitate the use of a procedural device. *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 236 (9th Cir. 1974) (Duniway, J., concurring). A certification which contemplates such an alteration can be attacked through a petition for a writ of mandamus. Therefore, in the absence of any indication in the record of what assumption, if any, was made by the district court, it is proper in responding to a petition for mandamus to indicate the nature of the assumption with respect to damages which will serve to make certification *not* arbitrary. It is not proper judicial administration to inform a trial court that its action is not arbitrary provided it behaves thereafter in a specific, but undisclosed, manner. Disclosure constitutes neither an advisory opinion nor erosion of that portion of *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) which holds that class certification is not an appealable order. What follows is the "disclosure" I believe to be appropriate.

### I.

*An Assumption That the Rescissory Measure of Damages Would Be Used Would Make Certification an Abuse of Discretion.*

My starting point is that the class members in this case did not deal face to face with the corporate defendant. Rather they purchased in the open market.[1] Whatever these purchasers "lost" did not directly accrue to the defendant. Such benefits as did accrue very likely were tangential and not closely correlated to the purchasers' "losses."[2] It follows that the proper meas-

---

1. I use the term "open market" herein to refer to frauds and misrepresentations from which no direct pecuniary gain accrues to defendant, such as those alleged in the instant case. However, there may be some open market activities, such as misleading statements by a corporation when it is repurchasing its own shares in the market, or when it is making a public offering, in which the defendant will have direct dealings with some plaintiffs. In such a case, or in a merger, the corporation itself might profit from the misrepresentations. My use of the term "open market" herein excludes these fact situations.

2. Direct pecuniary benefit would accrue where a corporate defendant in an open market situation makes a misrepresentation in a prospectus which inflates the price of its shares by $20 per share, and then itself sells 200,000 shares to the public. There is under these circumstances

**1342**

ure of damages is what the purchasers lost as a result of the defendant's wrong, not what the defendant gained.

The rescissory measure of damages does not properly measure that loss. The reason is that it permits a defrauded purchaser to place upon the defendant the burden of any decline in the value of the stock between the date of purchase and the date of disclosure of the fraud even though only a portion of that decline may have been proximately caused by the defendant's wrong. The other portion is the result of market forces unrelated to the wrong. Moreover, this decline is unrelated both to any benefits derived by the defendant from his fraud and to the blameworthiness of his conduct.

To understand the rescissory measure of damages and how it leads to these results it must be pointed out that in theory it contemplates a return of the injured party to the position he occupied before he was induced by wrongful conduct to enter the transaction. Assuming a sale and purchase of stock, true rescission would involve a return, on the one hand, of the purchase price and, on the other, of the stock purchased.. In many instances, however, the purchaser no longer possesses the stock when rescission is sought. Under those circumstances only the monetary equivalent of the stock can be returned. To adhere to the model of rescission the monetary equivalent should be determined as of the date the purchaser was under a present duty to return the stock, *viz.* the day of judgment. *See* Note, *The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities,* 26 Stan.L.Rev. 371, 372 (1974).

The courts generally, however, do not use the date of judgment but employ an earlier post-transaction date, such as the date of disclosure of the fraud. *Id.*

This measure (the difference between the purchase price and the value of the stock as of the date of disclosure) works justly when a defrauded *seller* proceeds after an *increase* in value of the stock against a fraudulent buyer who is unable to return the stock he fraudulently purchased. His inability to return the stock should not deprive the injured seller of the remedy of restitution. Under these circumstances it is appropriate to require the fraudulent buyer to account for his "ill-gotten profits" derived from an increase in the value of the stock following his acquisition of the stock. *See Janigan v. Taylor,* 344 F.2d 781 (1st Cir. 1965). *See also, Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Only in this manner can the seller be put in the position he occupied before the contract was made. *Cf.* 5 Corbin on Contracts, § 1112 (1964).

The measure, however, does not work properly when a defrauded *purchaser* who no longer possesses the stock proceeds after a *decline* in the stock's value against a fraudulent seller. The spread between purchase price and the value of the stock at the time the fraud is discovered has no necessary relationship to the amount needed to put the defrauded purchaser in the position he would have occupied had the contract of sale not been entered into. To return the aggrieved purchaser to this position the proper measure is the difference between the purchase price and the amount

nothing inequitable in requiring that corporation to reimburse the purchasers for their cumulative $4,000,000 loss. The corporation can presumably "fund" the repayment with the "ill-gotten gains." However, where the corporation does not deal in its own shares and there is aggregate trading of 2,000,000 shares during the relevant period, the market loss, under otherwise identical circumstances, of $40,000,000 may produce no identifiable pecuniary gain to the corporation.

It would be possible, of course, for a single set of misrepresentations to produce both kinds

of plaintiffs. Some plaintiffs might have dealt directly with the corporation while others, who traded in the market at the same time, did not. In my view, the very existence of a fund of "ill-gotten gain" may be ample justification for a rule of damages which shifts more of plaintiffs' investment risk on to the defendant. Hence, plaintiffs might be treated differently in such a case depending upon whether they dealt with the defendant or not. This case presents no such problem.

the purchaser received upon sale of the stock.

This difficulty does not exist when the defrauded purchaser retains the stock until the date of disclosure. The purchaser pursuing a remedy of restitution is entitled to the return of his purchase price upon return of the stock, or an amount equal to the purchase price reduced by the value of the stock at the date of disclosure. This remedy imposes upon the wrongful seller the burden of any loss in the value of the stock between the date of sale and the disclosure date. This is appropriate because the wrongful seller as a direct consequence of his wrong shifted to the purchaser the risks which he would have borne but for the wrongful sale. The seller's obligation to accept the return of the risk he wrongfully shifted is rooted in the contract of sale. That is, it springs from his contractual undertakings.

The obligations of a corporate defendant in an open market setting such as in this case are not rooted in a contract of sale. The corporate defendant sold nothing to the aggrieved purchaser. The purchaser acquired his stock from others in the open market. The misrepresentations of the corporate defendant did not result in a shift of the risks of loss in the value of the stock from it to the misled purchaser. There exists no undertaking on the part of the corporate defendant to assume responsibility for the purchaser's loss. The rescissory measure of damages, if used in these circumstances, cannot rest on the theory of restitution. The corporate defendant can return no purchase price because it never received the price. If such a measure is proper it must be because it is necessary to give effect to rule 10b–5.

I do not believe this necessity exists. Moreover, in the absence of an unnaturally steady market between the critical dates, it is not reasonable to regard the misrepresentations of the defendant as the proximate cause of all price declines. That is, a recovery sounding in tort, rather than contract, which imposes on the defendant losses not the proximate result of his wrong is not, in my opinion, a necessary or proper recovery under rule 10b–5. To impose upon the defendant the burden of restoring *all* investment losses by those who held their stock until disclosure burdens the defendant with certain losses which it neither caused nor with respect to which it assumed a responsibility.[3] I cannot believe rule 10b–5 contemplates a civil penalty so unpredictable in its scope. Nor do I believe that the rescissory measure is appropriate for purchasers who sold before disclosure date. The rescissory measure permits in those instances a recovery of all investment losses between the dates of purchase and sale.

I acknowledge, however, that management of the class in this and similar cases would be simplified by use of the rescissory measure of damages. Each plaintiff retaining his stock to the disclosure date would be required to prove only his purchase price while the disclosure date value would be applicable to all such class members alike. Purchasers selling before disclosure need only prove their purchase and sale price. The price of simplification is, however, too high. Wrongdoing defendants should not be mulcted to make simple the management of a class proceeding under rule 10b–5. To certify a class on the assumption that only by such means is the class manageable

---

**3.** The argument that but for the misrepresentation the stock would not have been purchased and that, as a consequence, all investment losses should be recoverable ignores the fact that the plaintiffs in this case relied not upon the misrepresentations themselves but merely on the assumption that the price of the stock was set by valid market conditions. The basis of the open market presumption of reliance has no necessary connection with the reasons which induce plaintiffs to buy the stock. It merely states that, having decided to purchase, plaintiffs are entitled to a price set by valid market forces unrelated to the misrepresentations. A typical rational investor does not purchase on the basis of current price alone. Price without more is no guide to investment. It may be true that the movement of price over time induced some investors to buy at the inflated price. But such a possibility is not part of the class-wide open market presumption of reliance.

would constitute, in my opinion, an abuse of discretion.[4]

## II.

*An Assumption That the Out-of-Pocket Measure Would Be Used Would Make Certification Not an Abuse of Discretion.*

The trial court's certification in this case may have proceeded on a different assumption. That is, its view may have been that damages should be determined by the so-called out-of-pocket measure. This measure fixes recovery at the difference between the purchase price and the value of the stock at the date of purchase.[5] This difference is proximately caused by the misrepresentations of the defendant. It measures precisely the extent to which the purchaser has been required to invest a greater amount than otherwise would have been necessary. It furthers the purpose of rule 10b-5 without subjecting the wrongdoer to damages the incidence of which resembles that of natural disasters. A certification on this assumption is neither arbitrary nor capricious although it does complicate the management of the class.

Complications result because it becomes necessary to establish, for the period between the date of the misrepresentations and the date of disclosure, data which when arranged on a chart will form, on the one hand, a "price line" and, on the other, a "value line." The price line will reflect, among other things, the effect of the corporate defendant's wrongful conduct. The establishment of these two lines will enable each class member purchaser who has not disposed of his stock prior to disclosure of the misrepresentations to compute his damages by simply subtracting the true value of his stock on the date of his purchase from the price he paid therefor. Fixing the value line for the entire period involved in this case is obviously a more difficult and complex task than would be establishing the price at the date of disclosure of the misrepresentations and the price at all relevant dates prior to disclosure. However, such intimations as have been reflected in the briefs and oral argument suggest that establishing the required value line is practicable. In any event, in my view the attempt is necessary if class certification in this case is to survive. The burden the effort will entail is the price which the avoidance of altering substantive rights requires.

This burden, however, does not, as the defendant argues, mean that the class is unmanageable and that certification is improper without regard to the measure of damages employed. Many individual actions would encounter an identical burden. Moreover, conflicts between class members, arising in a manner made explicit below, do not in my opinion make the trial court's certification arbitrary or capricious.

## III.

*Application of the Out-of-Pocket Measure To Purchasers Who Sell Before Disclosure.*

What has been said to this point regarding the out-of-pocket measure of damages has assumed that all class members held their stock until disclosure of the misrepre-

---

4. There exists, however, contrary authority which fixes the date for measuring value as of the date of discovery of the fraud. *See Harris v. American Investment Co.,* 523 F.2d 220 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), *cert. denied,* 394 U.S. 928 (1969). Both *Harris* and *Esplin* appear to assume that a "value line" cannot be established. I disagree. *See* text at 1344–1346. But even if the "value line" cannot be established, inability to prove the facts necessary to the imposition of damages under a proper measure of damages should not provide justification for the use of an improper measure. To do so is no more just than to require a tortfeasor who is responsible only for spraining the finger of a concert pianist to compensate him for the loss of his whole hand which loss was the result of being struck by lightning subsequent to the sprain and prior to the initiation of suit against the tortfeasor by the pianist.

5. *Estate Counseling Serv., Inc. v. Merrill Lynch,* 303 F.2d 527, 533 (10th Cir. 1962). *See Foster v. Financial Technology, Inc.,* 517 F.2d 1068 (9th Cir. 1975).

sentations. The spread between the price and value lines *at the date of purchase* provides the proper measure of recovery. Purchasers during the period in question who sell before disclosure present a somewhat more difficult issue.

The difficulty springs from uncertainty about whether the spread between the price and value lines remained constant during the entire period. Assuming for the moment that the spread remained constant, class member purchasers who sold before disclosure have recovered from the open market the "cost" of the misrepresentations. To permit such a purchaser-seller to recover this same "cost," *viz.* the spread between the price and the value lines at the date of purchase, from the defendant corporation would be to provide him with a double recovery. This is true without regard to whether the price at which he sold was greater or less than that at which he purchased. Any decline in the market price following purchase, under the assumption of a constant spread, is not attributable to

any wrong of the defendant. Its source is market forces unrelated to the misrepresentations.

The spread between the price and value lines may not remain constant, however. The spread, or value of the misrepresentations, may increase or decrease as a result of market forces operating on the misrepresentations. To illustrate, a false representation that the corporation has discovered oil will increase in value if the price of oil goes up subsequent to the misrepresentation.[6] Expressed in terms of price and value lines, the spread between the lines increases causing the lines to diverge. A decline in the price of oil, on the other hand, will reduce the value of the misrepresentation and cause the lines to converge.[7]

These changes in the spread are, to repeat, irrelevant to the purchaser who holds his stock until after disclosure.[8] Nor should a *divergence* be material to a purchaser who sells before disclosure. The increased value of the misrepresentation is recouped

**6.** A numerical example of subsequent events increasing the value of the misrepresentation is as follows. Assume Corporation C discloses the discovery of X barrels of oil when, in fact, no oil was discovered at all. Further assume that the per share value of X barrels of oil is $10. Following the false disclosure the stock sells on the open market at $150 per share. At this point, P purchases a share. Its true value is $140 ($150–$10). An oil embargo by the OPEC nations is imposed thereafter, and as a result of the embargo, the per share value of C's false disclosure increases to $25. The market value of the stock, assuming no other changes in such value, now stands at $165. P does not sell. In due course, the falsity of C's report is revealed and upon disclosure the stock drops to $140, its true value all the time. P's measure of damages should remain $10 notwithstanding the embargo which increased the value of the misrepresentation. The drop in value upon disclosure of $25 does not measure properly the extent of P's injury.

**7.** An example of convergence of price and value lines can be set forth by returning to the example in note 6, *supra*. Had the subsequent event been a massive discovery of oil in the United States rather than an embargo by the OPEC nations, the effect would have been to reduce the value of misrepresentation to, say, $5 per share. *Ceteris paribus,* the price of each share would decline to $145 while true value would remain at $140. This decline in the

value of misrepresentation should not diminish the recovery available to P who held his stock throughout.

**8.** If market forces, for example, increased the spread between the "price" and "value" lines, as a result of the value of the misrepresentation being increased by events subsequent to the misrepresentation, there is little reason to permit the increase to enhance the purchaser's recovery. If the purchaser correctly anticipated this increase, he would harvest the fruits of such prescience, but the fact that he does not is no indication that he suffered a loss proximately related to defendant's wrong. Similarly, a convergence of the price and value lines should not benefit the corporate wrongdoer. The defendant, in virtually all cases, will not have foreseen this ameliorative event and even in the rare case that it does, this would not seem to justify a reduction of plaintiffs' recovery.

The recovery of pre-judgment interest in 10b–5 actions such as this is left to the sound discretion of the trial court. *Wessel v. Buhler,* 437 F.2d 279, 284 (9th Cir. 1971). Cf. *Ross v. Licht,* 263 F.Supp. 395 (S.D.N.Y.1967); *Speed v. Transamerica Corp.,* 135 F.Supp. 176, 199 (D.Del.1955), aff'd, 235 F.2d 369 (3rd Cir. 1956). There is no difference for this purpose between a purchaser who holds until disclosure and one who sells prior thereto.

in the market place just as is the original value of the misrepresentation. A *convergence* of the price and value lines, however, presents a different question with respect to the purchaser who sells before disclosure. From the market he recoups only a portion of the original value of the misrepresentation for which he paid full value. The unrecovered portion should be recoverable from the corporate wrongdoer, even when the purchaser resells at a price greater than his cost.[9]

The advantage of convergence of price and value lines to purchasers who sell before disclosure creates a conflict between them and certain other purchasers. The former will be interested in narrowing the spread between the price and value lines on the date of his sale, while purchasers who bought on the date the former sold will be interested in increasing the spread. All purchasers who held their stock until disclosure are interested in establishing as wide a spread as possible on each date of purchase. These interests may require the creation of sub-classes; they do not, however, make class certification an arbitrary or capricious act.

## IV.

*Recovery Under Out-of Pocket Measure Possible Where Sales Price Exceeds Purchase Price.*

The out-of-pocket measure of damages, which I regard as the only measure which justifies class certification in this case, permits a recovery by purchasers who sold for a price greater than they paid for the stock. Thus, purchasers who disposed of their stock after disclosure are entitled to recover the difference between the price and value of the stock on the date of their purchase even though they ultimately sold the stock

for more than they paid for it.[10] Nor is a recovery of this amount precluded by the fact that the stock has never been sold. Purchasers who sold before disclosure, entitled to recovery because of a convergence of the price and value lines subsequent to their purchase, also may recover even though their selling price exceeded their purchase price.

The reason for these results is that the "cost" of the misrepresentations should be recovered from the wrongdoer to the extent not recovered in the open market. After disclosure, or a sale prior to disclosure following convergence of the price and value lines, recovery in the open market is impossible. The wrongdoer should compensate the purchasers for these losses no longer recoverable from the market. This obligation should not be satisfied by appropriating a portion of each purchaser's investment gains. This would be the consequence of denying any recovery so long as a purchaser's selling price exceeded the purchase price. To permit such an appropriation by a wrongdoer is no more just than to charge the wrongdoer with investment losses not proximately caused by his misrepresentations. The out-of-pocket measure employed properly is the only way to avoid these twin evils.

Assuming that the trial court's certification of the class was based on an intention to apply properly the out-of-pocket measure of damages, I concur in the result reached in Part IV of the Court's opinion.

9. Using the facts of footnote 7, *supra,* a resale when the stock's market price is $145 will permit recovery of only $5 of the $10 "cost" of the misrepresentation. The remaining $5 should be recovered from the wrongdoer.

10. Continuing with the example set forth in footnotes 7 and 9, a resale at $155 should not deprive the purchaser of a recovery of $5 from the corporate wrongdoer. The increase in price from $145 to $155 is not due to market forces related to the misrepresentation and in no event operate to absolve the defendant corporation of culpability. This investment gain should belong to the purchaser for the same reason that imposes upon him investment losses which are unrelated to the misrepresentation.