STATE of Wisconsin,
Plaintiff-Appellant-Cross-Respondent,

v.

Mark D. JENSEN,
Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 2004AP2481–CR. Oral argument January 11, 2006.
—Decided February 23, 2007.*

**2007 WI 26**

(Also reported in 727 N.W.2d 518.)

268

For the plaintiff-appellant-cross-respondent the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager*, attorney general.

For the defendant-respondent-cross-appellant there were briefs by *Craig W. Albee* and *Glynn, Fitzgerald, Albee & Strang, S.C.*, Milwaukee, and oral argument by *Craig W. Albee.*

¶ 1. JON P. WILCOX, J.   This case comes before us on a petition to bypass the court of appeals pursuant to Wis. Stat. § (Rule) 809.60 (2005–06). The State of Wisconsin appealed an order of the Kenosha County Circuit Court, Bruce E. Schroeder, Judge, denying the

admissibility of Julie Jensen's (Julie) letter to the police and her voicemail message and other oral statements to Officer Ron Kosman (Kosman). The defendant, Mark D. Jensen (Jensen), cross-appealed the same order of the circuit court denying his motion to exclude statements Julie made to her neighbor, Tadeusz Wojt (Wojt), and her son's teacher, Theresa DeFazio (DeFazio).

¶ 2. We affirm the order of the circuit court as to its initial rulings on the admissibility of the various statements under *Crawford v. Washington,* 541 U.S. 36 (2004). That is, the statements Julie made to Kosman, including the letter, are "testimonial," while the statements Julie made to Wojt and DeFazio are "nontestimonial." However, we reverse the circuit court's decision as to the applicability of the forfeiture by wrongdoing doctrine. Today, we explicitly adopt this doctrine whereby a defendant is deemed to have lost the right to object on confrontation grounds to the admissibility of out-of-court statements of a declarant whose unavailability the defendant has caused. As such, the case must be remanded to the circuit court for a determination of whether, by a preponderance of the evidence, Jensen caused Julie's unavailability, thereby forfeiting his right to confrontation.

I

¶ 3. A criminal complaint charging Jensen with first-degree intentional homicide in the December 3, 1998, poisoning death of his wife was filed in Kenosha County on March 19, 2002.

¶ 4. At Jensen's preliminary hearing conducted on April 23, 2002, and May 8, 2002, before the Honorable Carl M. Greco, Court Commissioner, the State

presented testimony from several witnesses including Wojt, Kosman, and Detective Paul Ratzburg (Ratzburg).

¶ 5. Wojt testified that just prior to Julie's death, she gave him an envelope and told him that if anything happened to her, Wojt should give the envelope to the police. Wojt also stated that during the three weeks prior to Julie's death, she was upset and scared, and she feared that Jensen was trying to poison her or inject her with something because Jensen was trying to get her to drink wine and she found syringes in a drawer. Julie also allegedly told him that she did not think she would make it through one particular weekend because she had found suspicious notes written by her husband and computer pages about poisoning.

¶ 6. Kosman testified that he received two voice-mails approximately two weeks prior to Julie's death. Julie told Kosman in the second voicemail that she thought Jensen was trying to kill her, and she asked him to call her back. Kosman returned Julie's call and subsequently went to her home to talk with her. Julie told Kosman that she saw strange writings on Jensen's day planner, and she said Jensen was looking at strange material on the Internet.[1] Julie also informed Kosman that she had photographed part of his day planner and gave the pictures, along with a letter, to a neighbor (Wojt). Julie then retrieved the picture, but not the letter from the neighbor, and gave it to Kosman telling him if she were found dead, that she did not commit suicide, and Jensen was her first suspect. Kosman also testified that in August or September of 1998, Julie told

---

[1] After Julie's death, police seized the computer in the Jensen's home and found that on various dates between October 15 and December 2, 2002, several websites related to poisoning were visited; including one entitled "Ethylene Glycol."

him it had become very "cold" in the residence and that Jensen was not as affectionate as he used to be. She claimed that when Jensen came home from work, he would immediately go to the computer.

¶ 7.  Finally, Ratzburg testified at the preliminary hearing that on the day after Julie's death, he received a sealed envelope from Wojt. The envelope contained a handwritten letter,[2] addressed to "Pleasant Prairie Police Department, Ron Kosman or Detective Ratzenburg" and bearing Julie's signature that read as follows:

> I took this picture [and] am writing this on Saturday 11–21–98 at 7AM. This "list" was in my husband's business daily planner—not meant for me to see, I don't know what it means, but if anything happens to me, he would be my first suspect. Our relationship has deteriorated to the polite superficial. I know he's never forgiven me for the brief affair I had with that creep seven years ago. Mark lives for work [and] the kids; he's an avid surfer of the Internet. . . .
>
> Anyway—I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week. Mark wants me to drink more—with him in the evenings. I don't. I would never take my life because of my kids—they are everything to me! I regularly take Tylenol [and] multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Immodium; have one prescription for migraine tablets, which Mark use[s] more than I.
>
> I pray I'm wrong [and] nothing happens . . . but I am suspicious of Mark's suspicious behaviors [and] fear for my early demise. However, I will not leave David [and] Douglas. My life's greatest love, accomplishment and wish:  "My 3 D's"—Daddy (Mark), David [and] Douglas.

---

[2] After comparing the letter to known writing samples from Julie, a document examiner with the State Crime Lab concluded that the letter was written by Julie.

¶ 8. Following the preliminary hearing, Jensen was bound over for trial, and an information charging Jensen with first-degree intentional homicide was filed. Jensen subsequently entered a plea of not guilty at his arraignment on June 19, 2002.

¶ 9. Among the pretrial motions Jensen filed were motions challenging the admissibility of the letter received by Ratzburg and the oral statements Julie allegedly made to Wojt and Kosman. Jensen also challenged the admissibility of oral statements Julie purportedly made to her physician, Dr. Richard Borman (Borman), and her son's teacher, DeFazio.[3] These motions were extensively briefed and argued before the court. The circuit court evaluated each of Julie's disputed statements independently to determine its admissibility under the hearsay rules and the then-governing test of *Ohio v. Roberts,* 448 U.S. 56 (1980). The court ruled that most, but not all, of the statements were admissible. Julie's entire in-person statements to Kosman and the letter sent to Ratzburg were admitted in their entirety.

---

[3] The criminal complaint provides the following summary of DeFazio's conversations with Julie on November 25, 1998:

> [W]hen I coaxed her, she told me how she was afraid her husband was going to kill her last weekend. When I asked her why she thought such a serious thing was going to happen, she explained why. She had found a paper listing things to buy in her husband's stuff. She said it listed syringes and names of drugs on it. Then she said that she thought he might try to kill her with a drug overdose and make it look like a suicide. I asked her why she thought he would do this. She said that there were other things she couldn't explain. She also wondered aloud if the drugs were for himself, but she didn't ever see him taking drugs so she didn't think that was the reason for the list. . . . One other time she had mentioned that it bothered her how every time she walked into the room when her husband was on the computer, he always turned it off or covered it quickly. She asked him why once, but he said he was doing business stuff, and he was done.

The State conceded the voicemails were inadmissible hearsay.

¶ 10. On May 24, 2004, Jensen moved for reconsideration on the admissibility of Julie's statements in light of the United States Supreme Court's ruling in *Crawford*, 541 U.S. 36. After a hearing on the motion, the circuit court orally announced its decision on June 7, 2004, and concluded that Julie's letter and voicemails were testimonial and therefore inadmissible under *Crawford*. The court rejected the State's argument that the statements were admissible under the doctrine of forfeiture by wrongdoing. The court also determined that Julie's statements to Wojt and DeFazio were non-testimonial, and therefore, the statements were not excluded. On August 4, 2004, the circuit court issued a written order memorializing its oral rulings.

¶ 11. The State appealed the court's ruling with respect to Julie's letter and her voicemail message to Kosman.[4] Jensen subsequently cross-appealed the ruling that the statements of Wojt and DeFazio were not excluded. After the State and Jensen had filed opening briefs in the court of appeals, the State filed a petition to bypass, which Jensen did not oppose. We granted the petition.

## II

¶ 12. Reduced to their essence, the appeal and cross-appeal concern the circuit court's determinations on the testimonial or nontestimonial nature of various

---

[4] The district attorney conceded that the statements Julie made to Kosman during a conversation on November 24, 1998, were testimonial. With respect to these statements, the State is arguing only that they are admissible under the forfeiture by wrongdoing doctrine, which is discussed in Section IV.

statements of Julie's that the State seeks to introduce.[5] "Although a circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review." *State v. Williams,* 2002 WI 58, 253 Wis. 2d 99, ¶ 7, 644 N.W.2d 919 (citing *State v. Ballos,* 230 Wis. 2d 495, 504, 602 N.W.2d 117 (Ct. App. 1999)). For purposes of that review, the appellate court must accept the circuit court's findings of fact unless they are clearly erroneous. *State v. Jackson,* 216 Wis. 2d 646, 575 N.W.2d 475 (1998).

### III

¶ 13. " 'The Confrontation Clause of the United States and Wisconsin Constitutions guarantee criminal defendants the right to confront witnesses against them.' " *State v. Manuel,* 2005 WI 75, ¶ 36, 281 Wis. 2d 554, 697 N.W.2d 811 (quoting *State v. Hale,* 2005 WI 7, ¶ 43, 277 Wis. 2d 593, 691 N.W.2d 637); U.S. Const. amend. VI;[6]

---

[5] In *State v. Manuel,* 2005 WI 75, ¶ 60, 281 Wis. 2d 554, 697 N.W.2d 811, this court held that nontestimonial statements still should be evaluated for Confrontation Clause purposes under the test of *Ohio v. Roberts,* 448 U.S. 56 (1980). The circuit court's findings under *Roberts* admitting some statements and excluding others were not reduced to a written order and they are not the subject of either the State's appeal or Jensen's cross-appeal.

[6] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"

Wis. Const. art. I, § 7.[7] We generally apply United States Supreme Court precedents when interpreting these clauses. *Hale,* 277 Wis. 2d 593, ¶ 43.

¶ 14.    In 2004 the U.S. Supreme Court fundamentally changed the Confrontation Clause analysis in *Crawford,* 541 U.S 36. Michael Crawford was charged and convicted of assault and attempted murder for stabbing a man, who allegedly tried to rape Crawford's wife, Sylvia. *Id.* at 38. At trial, the State played for the jury Sylvia's tape-recorded statement to the police describing the stabbing. *Id.* Sylvia did not testify at trial due to Washington's marital privilege; the privilege, however, did not extend to a spouse's out-of-court statements admissible under a hearsay exception. *Id.* at 40. Crawford contended that this procedure violated his. rights under the Confrontation Clause. *Id.* Relying on *Roberts,* the trial court concluded that the admission of Sylvia's statement was constitutionally permissible. *Id.* Under *Roberts,* when an out-of-court declarant is unavailable, his or her statement is admissible if it bears an adequate indicia of reliability, which could be satisfied if the statement fell within a firmly rooted hearsay exception or bore particularized guarantees of trustworthiness. *Roberts,* 448 U.S. at 66. The circuit court admitted the statement on the latter ground, and Crawford was convicted. *Crawford,* 541 U.S. at 40–41. The Washington Court of Appeals reversed, and the Washington Supreme Court then reinstated the conviction. *Id.* at 41–42.

¶ 15.    On certiorari, the U.S. Supreme Court determined that Crawford's constitutional right to confrontation was violated, and his conviction was re-

---

[7] Article I, Section 7 of the Wisconsin Constitution states that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face."

versed. *Id.* at 68–69. Justice Scalia, writing for the majority, announced a major shift in Confrontation Clause jurisprudence away from the *Roberts* reliability standard:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." ... To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Id.* at 61. The Court determined that the Confrontation Clause bars admission of an out-of-court-testimonial statement unless the declarant is unavailable and the defendant has had a prior opportunity to examine the declarant with respect to the statement. *Id.* at 68–69. The *Roberts* test remains when nontestimonial statements are at issue. *See Manuel,* 281 Wis. 2d 554, ¶¶ 54–55; *Crawford,* 541 U.S. at 68.

¶ 16.   The Court, unfortunately, did not spell out a comprehensive definition of what "testimonial" means. What we do know is that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford,* 541 U.S. at 68. The Court also noted that "testimony" is typically a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* at 51 (quoting *An American Dictionary of the English Language* (1828)). "An accuser who makes a formal statement to government officers bears testimony in a sense

that a person who makes a casual remark to an acquaintance does not." *Id.*

¶ 17.   The Court mentioned various formulations that had been proposed to define the "core class of 'testimonial' statements" but did not choose among these formulations. *Id.* at 51–52. In the Court's words, these formulations "all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it." *Id.* at 52:

> [E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.
>
> . . . .
>
> [E]xtrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.
>
> . . . .
>
> [S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52.

¶ 18.   This court subsequently adopted all three of the *Crawford* formulations, and reserved for another day whether these formulations or perhaps a different formulation would become the rule. *Manuel,* 281 Wis. 2d 554, ¶ 39. Applying this third formulation in *Manuel,* we concluded that a witness's statements to his girlfriend, Anna Rhodes (Rhodes), were nontestimonial.

Derrick Stamps (Stamps), the witness, told Rhodes that Manuel had shot the victim. *Id.,* ¶ 9. When Stamps was subsequently taken into custody, Rhodes informed police that Manuel had shot the victim. *Id.* At trial, the State sought to introduce the statements Stamps made to Rhodes that incriminated Manuel. However, Stamps refused to testify, so the State was forced to admit the statements through the arresting officer. *Id.,* ¶ 13. Manuel argued this violated his right to confrontation. *Id.,* ¶ 35. We reasoned that statements " 'made to loved ones or acquaintances . . . are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks.' " *Id.,* ¶ 53 (quoting *United States v. Manfre,* 368 F.3d 832, 838 n.1 (8th Cir. 2004)). Moreover, we reasoned that Stamps' girlfriend was not a government agent, and there was no reason to believe that Stamps expected his girlfriend to report to the police what he told her. *Id.* (citing *People v. Cervantes,* 12 Cal. Rptr. 3d 774, 783 (Cal. Ct. App. 2004)). Because the conversation was private with no eye towards litigation, we determined the statements were nontestimonial and thus subject to *Roberts* to determine whether there was a Confrontation Clause violation. *Id.,* ¶¶ 53, 60.

¶ 19. In deciding subsequent cases involving the Confrontation Clause, the U.S. Supreme Court retained its position from *Crawford* that it would not define the term "nontestimonial" beyond the three formulations of the classes of testimonial statements. *Davis v. Washington,* 126 S. Ct. 2266, 2273 (2006)(also deciding *Hammon v. Indiana*). The Court did find it necessary to slightly expand its previous discussion of what constitutes testimonial statements to resolve the cases presented, which involved police interrogations. It held as follows: "Statements are nontestimonial when made in the course of police interrogation under circum-

stances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 2273.

¶ 20.   In deciding this case, we are again left with the three formations of testimonial statements from *Crawford.* Like *Manuel,* only the third formulation listed above is applicable to the statements at issue in this case, as there was no ex parte in-court statements or extrajudicial statements made in formalized testimonial materials. For the reasons that follow, we hold that under the third *Crawford* formulation and the facts and circumstances of this case, the circuit court properly concluded, as a matter of law, that Julie's statements to the police and the letter are testimonial and Julie's statements to her neighbor, Wojt, and her son's teacher, DeFazio, are nontestimonial.

¶ 21.   Generally stated, the State argues that in determining whether a statement was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" what matters is the expectation of a reasonable person in the declarant's position rather than the subjective purpose of the particular declarant. The State further contends that government involvement in creating a statement is an indispensable feature of a testimonial statement. Alternatively, Jensen's basic thrust is that testimonial statements need not be elicited by the police, and accusatory statements directed to the police are testimonial.

¶ 22.   The parties' opposing positions represent the standard schools of thought of *Crawford*'s intended breadth and scope of testimonial statements. *See State v. Davis,* 613 S.E.2d 760, 767–68 (S.C. Ct. App. 2005). The narrow definition championed by Professor Akhil Reed Amar suggests that the Confrontation Clause

" 'encompasses only those "witnesses" who testify either by taking the stand in person or via government-prepared affidavits, deposition, videotapes, and the like.' " *Id.* at 767 (quoting A. Amar, *Confrontation Clause First Principles: A Reply to Professor Friedman,* 86 Geo. L.J. 1045 (1998)). Amar's focus is "what was the common understanding of being a witness against someone during the Founding Era[,]" and he contends that *Crawford* is implicated only when the circumstances surrounding the statement are formal. *Id.*

¶ 23. The broader definition is championed by Professor Richard Friedman. Under this school of thought, " 'a declarant should be deemed to be acting as a witness when she makes a statement if she anticipates that the statement will be used in the prosecution or investigation of a crime.' " *Id.* (quoting Richard D. Friedman, *Confrontation: The Search for Basic Principles,* 86 Geo. L.J. 1011, 1040–43 (1998)).

¶ 24. We note that there is support for the proposition that the hallmark of testimonial statements is whether they are made at the request or suggestion of the police. *See State v. Barnes,* 854 A.2d 208, 211 (Me. 2004). In our view, however, the Sixth Circuit's decision in *United States v. Cromer,* 389 F.3d 662 (6th Cir. 2004), aptly describes why such an inquiry is insufficient under *Crawford:*

> Indeed, the danger to a defendant might well be greater if the statement introduced at trial, without a right of confrontation, is a statement volunteered to police rather than a statement elicited through formalized police interrogation. One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation. . . . If

283

the judicial system only requires cross-examination when someone has formally served as a witness against a defendant, then witnesses and those who deal with them will have every incentive to ensure that testimony is given informally. The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

*Id.* at 675. Thus, we believe a broad definition of testimonial is required to guarantee that the right to confrontation is preserved. That is, we do not agree with the State's position that the government needs to be involved in the creation of the statement.[8] We believe such a narrow definition of testimonial could create situations where a declarant could nefariously incriminate a defendant.

---

[8] We note that recently in *State v. Hemphill,* 2005 WI App 248, 287 Wis. 2d 600, 707 N.W.2d 313, the court of appeals held that a declarant's spontaneous statement to responding police officers implicating the defendants in a crime was deemed nontestimonial. The court reasoned, in part as follows:

> The statement made by [the declarant] in the instant case does not fall into any of the identified categories of "testimonial" statements. This was not a statement extracted by the police with the intent that it would be used later at trial. It was not an interrogation situation. [The declarant] offered the statement without any solicitation from police. It was a spontaneous statement made to a responding police officer. Like the foreign cases cited by the State in its brief, the [declarant's] statement was offered unsolicited by the victim or witness, and was not generated by the desire of the prosecution or police to seek evidence against a particular subject.

*Id.,* ¶ 11. We do not read *Crawford* in such a restrictive light. Under the definition of testimonial adopted today we must overrule *Hemphill.*

¶ 25. The State cites to *United States v. Summers,* 414 F.3d 1287 (10th Cir. 2005), for its contention that the subjective purpose of the declarant is not important to the analysis. However, this is not a correct interpretation of the *Summers* decision. The Tenth Circuit concluded that "the 'common nucleus' present in the formulations which the Court considered centers on the *reasonable expectations of the declarant.*" *Id.* at 1302 (emphasis added) (citation omitted). The Tenth Circuit rejected the narrow approach argued in this case by the State, and held that "an objective test focusing on the reasonable expectations of the declarant under the circumstances of the case more adequately safeguards the accused's confrontation right and more closely reflects the concerns underpinning the Sixth Amendment." *Id.* (citing *Confrontation: The Search for Basic Principles, supra,* at 1040–43). In other words, "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime." *Id.*[9]

¶ 26. With these considerations in mind, we turn to the facts and circumstances of this case. We begin first with the statements Julie made in her letter. The circuit court concluded that the letter was testimonial as it had no apparent purpose other than to "bear testimony" and Julie intended it exclusively for accusatory and prosecutorial purposes. Furthermore, the circuit court stated, "I can't imagine any other purpose in

___

[9] As noted in *Summers,* other federal circuits have created similar standards. *United States v. Summers,* 414 F.3d 1287, 1302 n.9 (10th Cir. 2005) (citing *United States v. Cromer,* 389 F.3d 662 (6th Cir. 2004); *United States v. Hendricks,* 395 F.3d 173 (3d Cir. 2005); *United States v. Saget,* 377 F.3d 223 (2d Cir. 2004)).

sending a letter to the police that is to be opened only in the event of her death other than to make an accusatory statement given the contents of this particular letter." Indeed, the letter even referred to Jensen as a "suspect."

¶ 27.   In light of the standard set out above, we conclude that under the circumstances, a reasonable person in Julie's position would anticipate a letter addressed to the police and accusing another of murder would be available for use at a later trial. The content and the circumstances surrounding the letter make it very clear that Julie intended the letter to be used to further investigate or aid in prosecution in the event of her death. Rather than being addressed to a casual acquaintance or friend, the letter was purposely directed toward law enforcement agents. The letter also describes Jensen's alleged activities and conduct in a way that clearly implicates Jensen if "anything happens" to her.

¶ 28.   Furthermore, the State insists that the letter is nontestimonial because it was created before any crime had been committed so there was no expectation that the letter would potentially be available for use at a later trial. However, under the standard we adopt here it does not matter if a crime has already been committed or not. The focus of the inquiry is whether a "reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime." *Id.* We conclude that the letter clearly fits within this rubric.

¶ 29.   Perhaps most tellingly, Julie's letter also resembles Lord Cobham's letter implicating Sir Walter Raleigh of treason as discussed in *Crawford,* 541 U.S. at 44. At Raleigh's trial, a prior examination and letter of Cobham implicating Raleigh in treason were read to the

jury. *Id.* Raleigh demanded that Cobham be called to appear, but he was refused. *Id.* The jury ultimately convicted Raleigh and sentenced him to death. *Id.* In the Supreme Court's view, it was these types of practices that the Confrontation Clause sought to eliminate. *Id.* at 50. While Julie's letter is not of a formal nature as Cobham's letter was, it still is testimonial in nature as it clearly implicates Jensen in her murder. If we were to conclude that her letter was nontestimonial, we would be allowing accusers the right to make statements clearly intended for prosecutorial purposes without ever having to worry about being cross-examined or confronted by the accused. We firmly believe *Crawford* and the Confrontation Clause do not support such a result.

¶ 30. For many of the same reasons, we also determine that the voicemails to Kosman are testimonial.[10] The crux of Julie's message was that Jensen had been acting strangely and leaving himself notes Julie had photographed and that she wanted to speak with Kosman in person because she was afraid Jensen was recording her phone conversations. Again, the circuit court determined that these statements served no other purpose than to bear testimony and were entirely for accusatory and prosecutorial purposes. Furthermore, Julie's voicemail was not made for emergency purposes or to escape from a perceived danger. She instead sought to relay information in order to further the investigation of Jensen's activities. This distinction

---

[10] Additionally, although the circuit court considered whether the admission of the voicemails violated the Confrontation Clause under *Crawford,* the court already had excluded the voicemails as inadmissible hearsay. Thus, even if the voicemails are nontestimonial, they must still be excluded under *Roberts,* 448 U.S. 56.

convinces us that the voicemails are testimonial. *See Pitts v. State,* 627 S.E.2d 17, 19 (Ga. 2006) ("Where the primary purpose of the telephone call is to establish evidentiary facts, so that an objective person would recognize that the statement would be used in a future prosecution, then that phone call 'bears testimony' against the accused and implicates the concerns of the Confrontation Clause.").

¶ 31. Finally, we consider the statements Julie made to Wojt and DeFazio. Jensen argues that if the circumstances reveal that the declarant believed her statements to nongovernmental actors would be passed on to law enforcement officials, those statements are testimonial. While we reiterate that governmental involvement is not a necessary condition for testimonial statements, we conclude that under the circumstances of this case, Julie's statements to Wojt and DeFazio were nontestimonial. Essentially, we are not convinced that statements to a neighbor and a child's teacher, unlike the letter and voicemails—which were directly intended for the police—were made under circumstances which would lead a reasonable person in the declarant's position to conclude these statements would be available for later use at a trial.

¶ 32. Our decision in *Manuel,* 281 Wis. 2d 554, guides us to this conclusion. In *Manuel,* we determined that statements made to loved ones or acquaintances are not the memorialized type of statements that *Crawford* addressed. *Id.,* ¶ 53. Moreover, we determined that the witness's girlfriend was not a governmental agent, and there was no reason to believe the declarant expected his girlfriend to report to the police what he told her. *Id.* Here, Julie confided in Wojt and DeFazio about the declining situation in the Jensen household

288

and her statements are wholly consistent with the statements of a person in fear for her life. As one court put it, "when a declarant speaks with her neighbor across the backyard fence, she has much less of an expectation that the government will make prosecutorial use of those statements." *State v. Mizenko,* 127 P.3d 458, (Mont. 2006); *see also Compan v. People,* 121 P.3d 876, 880–81 (Colo. 2005) (holding that victim's statement to an acquaintance made after an assault were nontestimonial).

¶ 33.   In essence, we conclude that Julie's statements were informally made to her neighbor and her son's teacher and not under circumstances which would lead an objective witness to reasonably conclude they would be available at a later trial, and as such are nontestimonial. *See Crawford,* 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").[11]

¶ 34.   In sum, under *Crawford,* we conclude that Julie's letter and voicemail messages are testimonial, while her statements to Wojt and DeFazio are nontestimonial. We now turn to a discussion of the State's argument regarding the forfeiture by wrongdoing doctrine.

## IV

■

¶ 35.   Essentially, the forfeiture by wrongdoing doctrine states that an accused can have no complaint based on the right to confrontation about the use

---

[11] While we conclude that Julie's statements to Wojt and DeFazio were nontestimonial, this is not the same as concluding that they are admissible. When considering the admissibility of such evidence, the test from *Roberts,* 448 U.S. 56, applies. *Manuel,* 281 Wis. 2d 554, ¶ 60.

against him or her of a declarant's statement if it was the accused's wrongful conduct that prevented any cross-examination of the declarant. In this case, the State argues that Julie's statements, even if testimonial, should be admitted if the State can prove, by a preponderance of the evidence, that Jensen murdered his wife. For support of this argument, the State contends we look no further than *Crawford*.

¶ 36. As discussed in *Crawford,* the right of confrontation is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding. As the English authorities [] reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine." *Crawford,* 541 U.S. at 54. The Court recognized that there may have been some exceptions to the general rule of exclusion of hearsay evidence, but "there is scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case." *Id.* at 56. Here, the Court noted that one such deviation was for dying declarations; however, *Crawford* did not decide whether the Sixth Amendment incorporated such an exception for testimonial dying declarations. Instead, the Court stated that "[i]f this exception must be accepted on historical grounds, it is sui generis." *Id.* at 56 n.6.

¶ 37. After this discussion of historical exceptions to the Confrontation Clause, the Court turned its focus to the abrogation of the *Roberts* analysis to testimonial statements. In this discussion, the Court made the following statement:

> The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere

judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one. In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. *See Reynolds v. United States,* 98 U.S. 145, 158–59 (187[8]).

*Id.* at 62.

¶ 38. *Reynolds* was one of the first federal decisions to elaborate on the forfeiture by wrongdoing doctrine. In *Reynolds,* the defendant, George Reynolds, claimed that his right to confront a witness was violated when the lower court admitted into evidence testimony that was given at a former trial for the same offense with the same parties but under another indictment. *Reynolds,* 98 U.S. at 153. The witness, who was the alleged second wife of the accused, testified at a former trial against Reynolds. *Id.* at 160. At the former trial, the accused was present during her testimony and given the full opportunity to cross-examine the witness. *Id.* at 161. Prior to and after the commencement of the second trial, an officer attempted to deliver a subpoena to the witness but was unsuccessful on three separate occasions. *Id.* at 159–60. The trial court subsequently ruled that the witness's previous testimony could be admitted at trial because Reynolds did not refute that he had been instrumental in concealing or keeping the witness away. *Id.* at 160.

¶ 39. The *Reynolds* Court began its analysis with the following:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

*Id.* at 158. In other words, while the Constitution does grant a privilege of confronting ones accusers, that privilege is lost if the accuser causes the witness's unavailability at trial.

¶ 40.   Since the *Reynolds* decision, the Court has continued to acknowledge the concept that a defendant can forfeit through misconduct his or her confrontation rights.[12] *See, e.g., Diaz v. United States,* 223 U.S. 442, 451–53 (1912) (holding that a defendant waives[13] right

---

[12] The forfeiture by wrongdoing doctrine did not arise related to the Court's holding in *Davis v Washington*, 126 S. Ct. 2266, 2273 (2006), but the Court addressed it because the States, and their amici, raised it as an issue. Seemingly as dicta, the Court stated the following: "We reiterate what we said in *Crawford*:   that 'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.' That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Id.* at 2280 (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004)) (citations omitted).

[13] Although *Diaz v. United States,* 223 U.S. 442, 451–53 (1912), and other courts have used the term waiver in this

to object to a hearsay statement on confrontation grounds when he or she offers the statement); *Snyder v. Massachusetts,* 291 U.S. 97, 106 (1934) *overruled by Malloy v. Hogan,* 378 U.S. 1 (1964) (holding that defendant was permissibly excluded from going to view the scene of the crime as part of his trial. In dicta, Justice Cardozo stated that, "[n]o doubt the privilege [afforded by the Sixth Amendment] may be lost by consent or at times even by misconduct"); and *Illinois v. Allen,* 397 U.S. 337, 343 (1970) (holding that a defendant can lose his right to be present at trial, if after a warning by the judge, he continues his disruptive behavior).

¶ 41. The Eighth Circuit appears to be the first federal court to apply the forfeiture doctrine to a situation where the defendant had no prior opportunity to cross-examine the witness. *See United States v. Carlson,* 547 F.2d 1346 (8th Cir. 1976), *cert. denied,* 431 U.S. 914 (1977). *Carlson* held that the defendant waived his right to confrontation when he intimidated a witness into not testifying at trial; therefore the admission of the witness's prior grand jury testimony was permissible. *Id.* at 1360.

¶ 42. The *Carlson* court first noted that "[t]he Sixth Amendment does not stand as a shield to protect the accused from his own misconduct or chicanery." *Id.*

context, we conclude the term forfeiture is more appropriate "because the phrase 'forfeiture by wrongdoing' better reflects the legal principles that underpin the doctrine." *Commonwealth v. Edwards,* 830 N.E.2d 158, 168 n.16 (Mass. 2005). That is, there is an important distinction between the concept of waiver and forfeiture. "Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." *United States v. Goldberg,* 67 F.3d 1092, 1100 (3d Cir. 1995).

at 1359 (citing *Diaz,* 223 U.S. at 458; *Reynolds,* 98 U.S. at 159). The court acknowledged the distinction between its case and *Reynolds,* in that Reynolds was afforded the opportunity to cross-examine the witness at the time the former testimony was recorded. *Id.* at 1359 n.12. Carlson, however, was never afforded such an opportunity. *Id.* In the Eighth Circuit's view, "[t]o that extent, this case presents a more difficult question than *Reynolds.* However, by focusing on the defendant's conduct . . . there is a similarity and we are guided by the precept articulated in *Reynolds* that 'no one shall be permitted to take advantage of his own wrong.' " *Id.* (quoting *Reynolds,* 98 U.S. at 159). Ultimately, the court believed that permitting the defendant to "profit from such conduct would be contrary to public policy, common sense and the underlying purpose of the confrontation clause." *Id.* at 1359. However, the court did not go so far as to say that all extrajudicial statements may be admitted. *Id.* at 1360 n.14. Earlier in its opinion, the Eighth Circuit concluded that the witness's grand jury testimony was admissible hearsay pursuant to the residual exception of the Federal Rules of Evidence. *Id.* at 1353–55. In other words, the court determined that Carlson's right to confrontation was forfeited by misconduct and the disputed statement was admissible under the residual hearsay exception.

¶ 43. Subsequent to *Carlson* and a host of other cases from various federal and state jurisdictions, the forfeiture by wrongdoing doctrine was codified in 1997 in the Federal Rules of Evidence as a hearsay exception. Fed. R. Evid. 804(b)(6). This rule reads as follows:

Rule 804. Hearsay Exceptions; Declarant Unavailable

. . . .

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (6) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the decedent as a witness.

Fed. R. Evid. 804(b)(6). The Advisory Committee on Rules enacted such a rule because it believed there was a need for "a prophylactic rule to deal with abhorrent behavior 'which strikes at the heart of the system of justice itself.'" Notes of Advisory Committee on Rules —1997 Amendments to Federal Rules of Evidence (quoting *United States v. Mastrangelo,* 693 F.2d 269, 273 (2d Cir. 1982), *cert. denied,* 467 U.S. 1204 (1984)). Furthermore, the Committee recognized that "[e]very circuit that has resolved the question has recognized the principle of forfeiture by misconduct, although the tests for determining whether there is forfeiture have varied." *Id.* (list of cited cases omitted).

¶ 44. One notable example of a post-Fed. R. Evid. 804(b)(6) decision is *United States v. Emery,* 186 F.3d 921 (8th Cir. 1999). In *Emery,* the court concluded that the defendant forfeited his right to confrontation under *Carlson,* 547 F.2d 1346, and further he forfeited his right to object on hearsay grounds under Fed. R. Evid. 804(b)(6). Emery asserted that the admission of hearsay statements of a federal informant he was charged with murdering violated his right to confrontation. *Id.* at 926. Emery argued that the principles of the forfeiture by wrongdoing doctrine as stated in Fed. R. Evid. 804(b)(6) "should apply only in a trial on the underlying crimes about which he feared [the informant] would

testify, not in a trial for murdering her." *Id.* The *Emery* court concluded the following:

> We believe that both the plain meaning of Fed. R. Evid. 804(b)(6) and the manifest object of the principles just outlined mandate a different result. The rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence. Instead, it establishes the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness. Accepting Mr. Emery's position would allow him to do just that.

*Id.* Thus, the court held that Emery forfeited his right to object on both confrontation and hearsay grounds.

¶ 45.　Since the release of *Crawford,* many jurisdictions have either adopted the forfeiture by wrongdoing doctrine if they had not done so before, or they have expanded the doctrine to encompass more testimonial statements. For example, in *State v. Meeks,* 88 P.3d 789 (Kan. 2004), the defendant, Meeks, shot Green during a fight in the street. *Id.* at 791. The first officer on the scene asked Green who shot him, and he responded, "Meeks shot me." *Id.* at 792. This statement was later admitted at trial, and after Meeks was convicted, he argued on appeal his right to confrontation had been violated when the trial court admitted the statement because the statement lacked adequate indicia of reliability. *Id.* at 792–93.

¶ 46.　The Kansas Supreme Court, citing to *Reynolds,* held that a defendant forfeits his right to confrontation, and waives any hearsay objections if the witness's absence was due to the defendant's wrongdoing. *Id.* at 794. The *Meeks* court fully recognized that the underlying crime and the crime by which Meeks rendered the witness unavailable were the same, but

the court concluded this was immaterial to the analysis. For support, *Meeks* quoted an amicus brief of *Crawford* authored by a number of law professors and ultimately concluded the following:

> "If the trial court determines as a threshold matter that the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, *even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable.*"

*Id.* at 794 (citing Richard D. Friedman, *Confrontation and the Definition of Chutzpa,* 31 Israel L. Rev. 506 (1997) [hereinafter *Chutzpa*]).

¶ 47.   Indeed, Professor Friedman, a renowned expert on Confrontation Clause law, was one of the first to argue for a broad forfeiture by wrongdoing doctrine. In *Chutzpa,* Professor Friedman argued that identity between the victim and the declarant should not have any bearing on whether to apply what he phrased as the "reflexive forfeiture principle." *Chutzpa, supra,* at 521.

> I do not believe [] that this identity presents a reason not to apply the forfeiture principle. The identity should not distract us from the importance of deciding the evidentiary predicate. If the predicate is true, then ... the defendant's inability to confront the declarant is attributable to his own misconduct. And if that is true, the defendant should not be able to keep the declarant's statement out of evidence by a claim of the confrontation right. A court should not decline to decide the predicate question, for evidentiary purposes, simply because the same question must also be decided in making the bottom-line determination of guilt.

*Id.* at 522.

¶ 48. After *Crawford* was released, Friedman again reiterated his view on the forfeiture by wrongdoing doctrine in an article exploring the meaning of "testimonial" statements. *See* Richard D. Friedman, *Grappling with the Meaning of "Testimonial"*, 71 Brook. L. Rev. 241 (2005). In discussing whether a crime has to already have been committed in order for a statement to be considered testimonial, Friedman gave the following example: "Not necessarily: here I have in mind the cases in which an eventual murder victim, fearing her assailant, tells a confidante information to be used in the event that he does in fact assault her and render her unable to testify. . . . Again, forfeiture is probable in this situation." *Id.* at 250 n.27.

¶ 49. Other post-*Crawford* decisions also aid our analysis.[14] One of the most persuasive for our purposes is *United States v. Garcia-Meza,* 403 F.3d 364 (6th Cir. 2005). In that case, Garcia-Meza was on trial for the first-degree murder of his wife, Kathleen. *Id.* at 367. Five months prior to her murder, Garcia-Meza had assaulted Kathleen, and the district court permitted the government to introduce testimony from the investigating officers about what Kathleen told them. *Id.* at 369. After his conviction, Garcia-Meza argued that admission of this evidence violated his Confrontation Clause rights. *Id.*

---

[14] Other cases in which courts have applied the forfeiture by wrongdoing doctrine to situations where the defendant is charged with the same homicide that rendered the declarant unavailable include the following: *People v. Moore,* 117 P.3d 1 (Colo. Ct. App. 2004) (applying similar reasoning as *State v. Meeks,* 88 P.3d 789 (Kan. 2004)); *Gonzalez v. State,* 155 S.W.3d 603 (Tex. App. 2004) (same); and *United States v. Mayhew,* 380 F. Supp. 2d 961 (S.D. Ohio 2005) (same).

¶ 50. Without deciding whether Kathleen's statements were testimonial or not, the Sixth Circuit determined that Garcia-Meza had forfeited his right to confront Kathleen because his wrongdoing was responsible for her unavailability. *Id.* at 370 (citing *Crawford,* 541 U.S. 36; *Reynolds,* 98 U.S. 145). After noting that it was undisputed that Garcia-Meza killed his wife,[15] the Sixth Circuit dispelled the notion that in order for the forfeiture by wrongdoing doctrine to apply, Garcia-Meza had to commit the murder with the specific intent to prevent her from testifying:

> There is no requirement that a defendant who prevents a witness from testifying against him through his own wrongdoing only forfeits his right to confront the witness where, in procuring the witness's unavailability, he intended to prevent the witness from testifying. Though the Federal Rules of Evidence may contain such a requirement, the right secured by the Sixth Amendment does not depend on, in the recent words of the Supreme Court, "the vagaries of the Rules of Evidence." The Supreme Court's recent affirmation of the "essentially equitable grounds" for the rule of forfeiture strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive. The Defendant, regardless of whether he intended to prevent the witness from testifying against him or not, would benefit through his own wrongdoing if such a witness's statements could not be used against him, which the rule of forfeiture, based on principles of equity, does not permit.

*Id.* at 370–71 (internal citations omitted).

---

[15] Garcia-Meza's defense was that he did not have the necessary premeditation for first-degree murder because he was too intoxicated. *United States v. Garcia-Meza,* 403 F.3d 364, 367 (6th Cir. 2005).

¶ 51. The general timeline of events in *Garcia-Meza* and this case are substantially similar. Specifically, in *Garcia-Meza* the events of the case played out as follows: (1) the declarant gave a statement; (2) the defendant commits a crime rendering the declarant unavailable; (3) the defendant is charged with the declarant's death; and (4) the government seeks to introduce the declarant's prior statement. The difference between these cases is that there was no dispute in *Garcia-Meza* that the defendant was responsible for the declarant's unavailability. However, we do not believe that this distinction means the forfeiture by wrongdoing doctrine cannot apply. If the circuit court determines, in a pre-trial decision by the court, that Jensen caused his wife's unavailability, then the forfeiture by wrongdoing doctrine applies to Jensen's confrontation rights, and otherwise testimonial evidence may be admitted.

¶ 52. In essence, we believe that in a post-*Crawford* world the broad view of forfeiture by wrongdoing espoused by Friedman and utilized by various jurisdictions since *Crawford*'s release is essential. In other words, after "[n]oting the broad embrace of the doctrine" by courts nationwide and "recognizing the compelling public policy interests behind its enactment," *Commonwealth v. Edwards,* 830 N.E.2d 158, 165 (Mass. 2005), we elect to adopt the forfeiture by wrongdoing doctrine in Wisconsin.

V

¶ 53. Having concluded the forfeiture by wrongdoing doctrine is appropriate in Confrontation Clause cases, we now analyze the appropriate standard of review for the circuit court to apply on remand.

¶ 54. As Justice Prosser noted in his concurrence in *Hale,* most jurisdictions require proof of the defendant's wrongdoing by a preponderance of the evidence. *Hale,* 277 Wis. 2d 593, ¶ 96 (Prosser, J., concurring) (citing *Emery,* 186 F.3d at 927; *United States v. White,* 116 F.3d 903, 912 (D.C. Cir. 1997); *United States v. Houlihan,* 92 F.3d 1271, 1280 (1st Cir. 1996); *Steele v. Taylor,* 684 F.2d 1193, 1201 (6th Cir. 1982); *United States v. Rivera,* 292 F. Supp. 2d 827, 831 (E.D. Va. 2003) ; *State v. Hallum,* 606 N.W.2d 351, 355–56 (Iowa 2000)). *See also Edwards,* 830 N.E.2d at 172 nn. 24, 25 (collecting cases). A few courts, however, use the "clear and convincing evidence" standard of proof. *Hale,* 277 Wis. 2d 593, ¶ 96 (citing *United States v. Thevis,* 665 F.2d 616, 631 (5th Cir. 1982); *People v. Giles,* 19 Cal. Rptr. 3d 843, 848 (Cal. Ct. App. 2004)).

¶ 55. Citing to Professor Friedman's view, Jensen argues that "given the importance of the confrontation right, the court should not hold that the accused has forfeited it unless the court is persuaded to a rather high degree of probability that the accused has rendered the declarant unavailable." *Chutzpa, supra,* at 519. In other words, Jensen argues that given the seriousness of the charges against him and given the presumption that he is innocent until proven guilty, a higher standard of clear and convincing evidence should be used.

¶ 56. As noted by one court, "[r]equiring the court to decide by a preponderance of the evidence the very question for which the defendant is on trial may seem, at first glance, troublesome." *United States v. Mayhew,* 380 F. Supp. 2d 961, 967 (S.D. Ohio 2005). For the following reasons, however, the *Mayhew* court, like the jurisdictions cited in the *Hale* concurrence, concluded that equitable considerations demand such a result. The court based its conclusion on the "equitable principles

outlined in *Crawford,* the jury's ignorance of the court's threshold evidentiary determination, and the analogous evidentiary paradigm of conspiracy." *Id.* at 968. On this last point, *Mayhew* aptly describes the similarity between conspiracy and the application of the forfeiture by wrongdoing doctrine and why the idea of "bootstrapping" should not be worrisome to us:

> For example, statements offered against a defendant to prove his participation in a charged conspiracy are admissible if the court first finds, by a preponderance of the evidence, that the conspiracy for which defendant is on trial existed. *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987) .... The same principle applies to the forfeiture doctrine when the court makes a preliminary determination as to whether the defendant committed the crime for which he is [] charged. *See Emery,* 186 F.3d at 926 (basing its approach to the forfeiture doctrine on the co-conspirator cases, noting "the functional similarity of the questions involved ...."); *see also White,* 116 F.3d at 912 ("[T]he forfeiture finding is the functional equivalent of the predicate factual finding that a court must make before admitting hearsay under the co-conspirator exception.").

*Id.* We agree with the reasoning of *Mayhew,* and the multitude of other jurisdictions and adopt a preponderance of the evidence standard.[16]

¶ 57. In short, we adopt a broad forfeiture by wrongdoing doctrine, and conclude that if the State can

---

[16] Related to the proper burden of proof, the Court in *Davis* stated the following: "We take no position on the standards necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard." *Davis,* 126 S. Ct. at 2280 (citations omitted).

prove by a preponderance of the evidence that the accused caused the absence of the witness, the forfeiture by wrongdoing doctrine will apply to the confrontation rights of the defendant.

## VI

¶ 58. To conclude, we affirm the order of the circuit court as to its initial rulings on the admissibility of the various statements under *Crawford,* 541 U.S. 36. That is, the statements Julie made to Kosman, including the letter, are testimonial, while the statements Julie made to Wojt and DeFazio are nontestimonial. However, we reverse the circuit court's decision as to the applicability of the forfeiture by wrongdoing doctrine. Today, we explicitly adopt this doctrine whereby a defendant is deemed to have lost the right to object on confrontation grounds to the admissibility of out-of-court statements of a declarant whose unavailability the defendant has caused. As such, the cause must be remanded to the circuit court for a determination of whether, by a preponderance of the evidence, Jensen caused Julie's unavailability, thereby forfeiting his right to confrontation.

*By the Court.*—The order of the circuit court is affirmed in part; reversed in part; and the cause is remanded.

¶ 59. LOUIS B. BUTLER, JR., J. *(concurring in part, dissenting in part).* The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In *all* criminal prosecutions, *the accused shall enjoy the right . . . to be confronted with the witnesses against him*" (emphasis added). Article I,

303

section 7 of the Wisconsin Constitution similarly provides: "In *all* criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face" (emphasis added).[1] The operative word in each of these constitutional provisions is the word "all". Neither provision creates a homicide exception to the constitutional guarantee of confrontation. Yet, the majority's misconception of the doctrine of forfeiture by wrongdoing does precisely that, defeating the confrontation guarantee contained within the state and federal constitutions. Moreover, the majority fails to properly apply the recent decision of *Davis v. Washington,* 547 U.S. ___, 126 S. Ct. 2266 (2006), in ascertaining whether statements made to certain witnesses in this case are testimonial or nontestimonial. Accordingly, I respectfully concur in part, and dissent in part.

I

¶ 60.  At issue in this case are numerous statements made by the homicide victim, Julie Jensen (Julie), to her neighbor, Tadeusz Wojt (Wojt), police officer Ron Kosman (Kosman), her physician, Dr. Richard Borman (Borman), and her son's teacher, Theresa DeFazio (DeFazio), as well as a letter she wrote to Detective Paul Ratzburg (Ratzburg). The circuit court on September 4, 2003, reviewed over 100 statements made by Julie and evaluated the reliability of these statements using the balancing test established in *Ohio v. Roberts,* 448 U.S. 56 (1980). The court ruled that parts of many of her statements were not excluded, while other parts were excluded. The court also reserved its ruling with respect to some of the statements

---

[1] As the majority notes, we generally apply United States Supreme Court precedents when interpreting these clauses. Majority op., ¶ 13.

until the trial, and reserved the right to reverse itself based on how the evidence was offered at trial. In addition, Julie's in-person statements to Kosman and her letter to Ratzburg were admitted in their entirety.

¶ 61. Mark Jensen (Jensen), the defendant, moved for reconsideration on the admissibility of Julie's statements in light of the United States Supreme Court ruling in *Crawford v. Washington,* 541 U.S. 36 (2004). After a hearing, the circuit court concluded that Julie's letter to Ratzburg and voicemail messages to Kosman were testimonial and therefore inadmissible under *Crawford.* The circuit court also determined that Julie's statements to Wojt and DeFazio were nontestimonial, and, therefore, the court's prior rulings on the admissibility of such statements remained in effect.

¶ 62. The majority concludes that the statements that Julie Jensen made to Kosman prior to her death and the statements made by her in her letter to Ratzburg constitute testimonial evidence, while the statements she made to Wojt and DeFazio constitute nontestimonial evidence.[2] Majority op., ¶ 2. The majority concludes that the court's initial determination to admit the nontestimonial evidence was proper. Majority op., ¶ 58. As to the testimonial evidence, however, the majority adopts a broad forfeiture by wrongdoing doctrine and remands the case to the circuit court to determine whether the State can prove, by a preponderance of the evidence, that Mr. Jensen caused the unavailability of his wife. *Id.*

---

[2] I agree with and join that part of the majority opinion that concludes that the statements to Kosman and the letter to Ratzburg were testimonial. I do not discuss these statements further. I also agree that the statements made by Julie to DeFazio are nontestimonial, for reasons stated later in this opinion. At issue are the statements made by Julie to Wojt.

305

¶ 63. I disagree that all of the statements made by Julie to Wojt and to DeFazio are nontestimonial. I do agree with the majority that this court should adopt the doctrine of forfeiture by wrongdoing, and that, under a proper application of the doctrine, the burden be placed upon the State to establish the doctrine's applicability by a preponderance of the evidence. Because I conclude, contrary to the majority, that the forfeiture doctrine should be applied (1) where the defendant caused the absence of the witness *and* (2) did so for the purpose of preventing the witness from testifying, I respectfully dissent in part.

## II

¶ 64. As noted previously, under the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [or her]." In order to properly interpret this right of confrontation, we must understand the original intent of the Framers in adopting the Sixth Amendment.

¶ 65. In *Crawford,* the United States Supreme Court examined the historical background that culminated in the creation of this Sixth Amendment right of confrontation. *Crawford,* 541 U.S. at 43. The founding fathers' immediate source of the Confrontation Clause was English common law. *Id.* That common law tradition is one of live testimony in court subject to adversarial testing. *Id.*

¶ 66. The Court explained that in the 16th and 17th centuries, witnesses' statements against an accused could be read to the jury, and the accused was offered no opportunity to cross-examine his or her accuser. In reaction to some of these cases, "English law

developed a right of confrontation that limited these abuses." *Id.* at 44. First, courts developed relatively strict rules of unavailability. *Id.* at 44–45. Second, "[o]ne recurring question was whether the admissibility of an unavailable witness's pretrial examination depended on whether the defendant had had an opportunity to cross-examine him." *Id.* at 45. For example, in 1696 the Court of King's Bench ruled that "even though a witness was dead, his examination was not admissible where 'the defendant not being present when [it was] taken before the mayor . . . had lost the benefit of a cross-examination.' " *Id.* (quoting *King v. Paine,* 5 Mod. 163, 165, 87 Eng. Rep. 584, 585 (1696)). By the mid-1700s, the right of an accused to confront any witness against the accused was firmly rooted in English common law, and the right of confrontation was included in declarations of rights adopted by at least eight of the original colonies. *Id.* at 48. This right was ultimately included in the Sixth Amendment to the United States Constitution. *Id.* at 48–49. Indeed, several American authorities flatly rejected any special status that would allow for the admissibility of statements made to a coroner absent cross-examination. *Id.* at 47 n.2.

¶ 67.    The *Crawford* court also reviewed the first judicial interpretations of the Confrontation Clause because these cases "shed light upon the original understanding of the common-law rule." *Id.* at 49. For example, the court in *State v. Webb* concluded "that depositions could be read against an accused only if they were taken in [the defendant's] presence." *Id.* (citing *State v. Webb,* 2 N.C. 103 (Super. L. & Equ. 1794)). Similarly, in *State v. Campbell,* South Carolina excluded the deposition of a deceased witness because the deposition was taken in the absence of the accused. *Id.* (quoting *State v. Campbell,* 30 S.C.L. 124 (App. L. 1844)). That court concluded:

307

[N]otwithstanding the death of the witness, and whatever the respectability of the court taking the depositions, the solemnity of the occasion and the weight of the testimony, such depositions are ex parte, and, therefore, utterly incompetent.

*Id.* (quoting *Campbell,* 30 S.C.L. 124).

¶ 68. The court in *Crawford* concluded that the history of the Confrontation Clause supports two inferences. *Id.* at 50. First, the principal purpose of the Confrontation Clause was to exclude the use of ex parte examinations as evidence against the accused. *Id.* Second, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he [or she] was unavailable to testify, *and the defendant had had a prior opportunity for cross-examination." Id.* at 53–54 (emphasis added). The *Crawford* court emphasized that this right of confrontation under the Sixth Amendment "is most naturally read as a reference to the right of confrontation at common law, *admitting only those exceptions established at the time of the founding."*[3] *Id.* at 54 (citations omitted) (emphasis added). Moreover, the United States Supreme Court has recently reaffirmed its reliance on this narrow, historical interpretation of the Confrontation Clause as described in *Crawford. Davis,* 126 S. Ct. at 2274 n.1.

¶ 69. Based on this historical approach, the court in *Crawford* explicitly rejected the admission of otherwise inadmissible testimonial evidence based on the reliability test established in *Ohio v. Roberts,* 448 U.S. 56 (1980).[4]

---

[3] This principle has been totally abandoned by the majority in its adoption and application of a broad forfeiture by wrongdoing doctrine, as I will discuss later in this opinion.

[4] We have previously recognized that Wisconsin follows the reliability standard established in *Ohio v. Roberts,* 448 U.S. 56

This [Roberts] test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of ex parte testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that do consist of ex parte testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

. . . .

. . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

. . . .

The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one.

*Crawford,* 541 U.S. at 60–62.

¶ 70. The court recognized that although there existed exceptions to the general rule of exclusion, "there is scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a

(1980), for evaluating the admissibility of nontestimonial evidence. *State v. Manuel,* 2005 WI 75, ¶ 3, 281 Wis. 2d 554, 697 N.W.2d 811.

*criminal* case." *Crawford,* 541 U.S. at 56 (emphasis in original). The *Crawford* court explained that this historical context suggests that the requirement of a prior opportunity for cross-examination was "dispositive, and not merely one of several ways to establish reliability." *Id.* at 55–56. The *Crawford* court unequivocally concluded:

> Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.

*Id.* at 59 (footnote omitted).

### III

¶ 71.  Testimonial statements cause the declarant to be a "witness" within the meaning of the Confrontation Clause. *Davis,* 126 S. Ct. at 2273. The court in *Crawford* did discuss a historical dictionary definition of "testimony." *Crawford,* 541 U.S. at 51. The court noted that the dictionary defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)). Relying on this definition of "testimony," the *Crawford* court concluded that "testimony" constitutes "[a]n accuser who makes a formal statement to government officers [and] bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* The *Crawford* court, however, declined to spell out a comprehensive definition of "testimonial."[5] *Crawford,* 541 U.S. at 68.

---

[5] In Wisconsin, at a minimum, testimonial evidence includes ex parte in-court testimony or its functional equivalent

¶ 72. In *Davis,* the United States Supreme Court recently shed some additional light on the difference between testimonial and nontestimonial evidence, in the limited context of police questioning:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis,* 126 S. Ct. at 2273–74.

¶ 73. The Court in the *Davis* matter concluded that the declarant was speaking to the police officer about events as they were actually happening, rather than describing past events about an ongoing emergency, and that consequently the statements in question were not testimonial. *Id.* at 2276–77. The court later clarified that the police officer's interrogation of the witness in the *Hammon*[6] matter was testimonial because it was clear that the interrogation was part of

(such as affidavits, custodial examinations, prior testimony not subject to cross-examination by the defendant, or similar pretrial statements declarants would reasonably expect to be used prosecutorially), extrajudicial statements contained in formalized testimonial materials (such as affidavits, depositions, prior testimony, or confessions), and statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Manuel,* 281 Wis. 2d 554, ¶¶ 37, 39.

[6] *Hammon v. Indiana,* 547 U.S. ___, 126 S. Ct. 2266 (2006) (decided in the same opinion as *Davis v. Washington*).

an investigation of past criminal events and that there was "no emergency in progress." *Id.* at 2278.

¶ 74. The court noted that this description was in the context of interrogations because the cases they were examining involved interrogations. The court explicitly recognized that simply because a statement is made in the absence of any interrogation does not necessarily mean the statement is nontestimonial. "The Framers were no more willing to exempt from cross-examination *volunteered testimony* or answers to open-ended questions than they were to exempt answers to detailed interrogation." *Id.* at 2274 n.1 (emphasis added). It is with the above constitutional principles in mind that I examine the statements to Wojt and DeFazio.

## A

¶ 75. I begin with the statements allegedly made by Julie Jensen to Tadeusz Wojt. During the week of November 9, 1998, Julie Jensen told Mr. Wojt that she was upset because her marriage was in trouble, that she and the defendant argued about everything, that she suspected that the defendant was having an affair, and talked about a number of marital problems between the two of them. Similarly, Julie had conversations with Malgorzata Wojt on December 1 and 2, 1998, that were about day care and school, Julie getting a job, Julie's doctor appointment, some medicine she took, and the defendant being good to her. Because the "primary purpose" of these conversations between Julie and the Wojts was not "to establish or prove past events potentially relevant to later criminal prosecution[,]" I agree with the majority that the statements made during the

312

week of November 9, and on December 1 and December 2, 1998, were nontestimonial. *See* majority op., ¶¶ 31–33.

¶ 76. The majority's analysis does not hold true for the remainder of the statements made by Julie to Mr. Wojt. On November 21, 1998, Julie told Wojt that the defendant was going to poison her. She described past events that would be potentially relevant to a criminal prosecution, including the defendant leaving syringes in a drawer and looking up something on the computer having to do with poison, and her finding notes written by him which had to do with poison. Wojt told her to call the police.

¶ 77. The very next day, Julie gave Wojt an envelope with instructions to give it to the police if anything happened to her. She also gave him a roll of undeveloped film, indicating that these were photographs of things the defendant would look up or note referencing poisoning. Earlier that day, she told Wojt that the defendant was trying to pressure her to eat or drink, and that he would become angry when she refused. She told Wojt that she called the police, but that they were not available. She did not sleep that night, and did not think she would live out the weekend.

¶ 78. On November 24, 1998, she asked Wojt to return the roll of film to her, as she was going to give it to the police. She repeated her fears to Wojt between November 24 and November 28, 1998, and to Ms. Wojt on November 29, 1998.

¶ 79. Clearly, the primary purpose of each of these conversations was to establish or prove past events potentially relevant to a later criminal prosecution, that of Julie's husband, the defendant. Indeed, as to the purpose of the statements, the circuit court recognized as much when it wrote: "Mrs. Jensen's statements to

the Wojts . . . could be viewed as remarks which were intended for the ears of the police, when viewed in conjunction with the conversations which she had with Officer Kossman." The reason that the circuit court rejected that conclusion was twofold.

¶ 80.  First, the circuit court's decision of August 4, 2004, was based in part upon the fact that the United States Supreme Court "did not adopt in *Crawford* the argument that 'testimonial statements' include any 'statements that were made in circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " Based on our decision in *State v. Manuel,* 2005 WL 75, ¶ 3, 281 Wis. 2d 554, 697 N.W.2d 811, we now know that the circuit court's conclusion was in error, as Wisconsin subsequently adopted that standard for testimonial evidence.

¶ 81.  Second, in ruling on the evidence that would be available to the jury, the circuit court believed it would have to abandon neutrality and embrace the theme offered by the defendant that Mrs. Jensen's motives were suicidal and malicious. Yet, the circuit court recognized that Julie's statements could have been motivated by those purposes, as well as driven by many other considerations. The standard for determining whether evidence is testimonial is its potential relevance to a later prosecution. Given that the circuit court acknowledged that multiple purposes could be deduced from the proffer of evidence, and based its ruling on an erroneous view of the law, I would conclude that the statements in question meet the requisite standard for "testimonial."

¶ 82.  The statements were also relevant to establish or prove past events that were potentially relevant to the prosecution of the defendant. The syringes had

already been left in the drawer. The notes about poisoning had already been made by the defendant. She had already viewed the computer in relation to poisoning. She had already taken pictures of a number of these items. He had already tried to pressure her to eat or drink. As she indicated to Wojt when she gave him the envelope to give to the police, she wanted the police to have that information should anything happen to her. It is obviously relevant to the defendant's prosecution, or the State would not attempt to use it. And it was expressly her purpose to identify her killer should anything happen to her. These statements, given by Julie to the Wojts, were simply as testimonial as they come. I respectfully disagree with the majority's conclusion to the contrary.

## B

¶ 83.   Whether the statements made by Julie to DeFazio are testimonial presents a tougher question. After reviewing the statements from November 25 and December 2, 1998, made by Julie to DeFazio, I conclude that the majority is correct in its determination that these statements are nontestimonial in nature. *See* majority op., ¶¶ 31–33. While these statements reflect, in part, past events potentially relevant to later prosecution, it cannot be seriously argued that Julie's purpose when making these statements was to establish or prove those past events.

## IV

¶ 84.   The right of confrontation is not absolute. The *Crawford* court explicitly recognized that one exception to the inadmissibility of testimonial evidence under the Confrontation Clause is the forfeiture by

wrongdoing exception. *Crawford,* 591 U.S. at 62. That exception "is most naturally read as a reference to the right of confrontation at common law, *admitting only those exceptions established at the time of the founding.*" *Id.* at 54 (citations omitted) (emphasis added).

¶ 85.   The *Crawford* court relied on *Reynolds v. United States,* 98 U.S. 145 (1879), in concluding that the rule of forfeiture by wrongdoing exception "extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability." *Id.* at 62 (citing *Reynolds,* 98 U.S. at 158–159).

¶ 86.   In *Reynolds,* the United States Supreme Court discussed the application of the forfeiture by wrongdoing rule to the Confrontation Clause:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

*Reynolds,* 98 U.S. at 158. *Reynolds,* in turn, relied on *Lord Morley's Case,* from 1666, in which the House of Lords held:

> [I]n case oath should be made that any witness, who had been examined by the coroner and was then absent, *was detained by the means or procurement of the*

*prisoner,* and the opinion of the judges asked whether such examination might be read, we should answer, that if their lordships were satisfied by the evidence they had heard that the witness was detained by means or procurement of the prisoner, then the examination might be read; but whether he was detained by means or procurement of the prisoner was matter of fact, of which we were not the judges, but their lordships.

*Id.* at 158 (emphasis added).

¶ 87. The court in *Reynolds* also noted that in *Regina v. Scaife* (17 Ad. & El. N. S. 242), a unanimous court determined that "if the prisoner had resorted to a contrivance to keep a witness out of the way, the deposition of the witness, taken before a magistrate and in the presence of the prisoner, might be read." *Id.*

¶ 88. The *Reynolds* court explained that the forfeiture by wrongdoing rule "has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Id.* at 159. Applying this principle to the facts before the court, where the witness had testified at a prior trial and the defendant had full opportunity of cross-examination, the court in *Reynolds* held the testimony admissible, explaining that

[t]he accused ... had full opportunity to account for the absence of the witness, if he would, or to deny under oath that he had kept her away. Clearly, enough had been proven to cast the burden upon him of showing that he had not been instrumental in concealing or keeping the witness away.

*Id.* at 160.[7]

---

[7] The majority does not address the fact that the doctrine of forfeiture by wrongdoing at common law merely provided that "if a witness is kept away by the adverse party, his testimony, *taken on a former trial between the same parties upon the same*

¶ 89. The United States Supreme Court again reaffirmed the forfeiture exception in *Davis,* stating "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington,* 126 S. Ct. at 2280. The *Davis* court reasoned: "[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." *Id.* The Court took no position on the standards necessary to justify application of the doctrine of forfeiture by wrongdoing, although it did cite Federal Rule of Evidence 804(b)(6) as codifying the doctrine, and that under the federal rule, the government has generally been held to the preponderance-of-the-evidence standard. *Id.* The Court also noted that state courts tend to follow the same practice as the federal rule. *Id.*

---

*issues,* may be given in evidence." *Reynolds v. United States,* 98 U.S. 145, 158–59 (1879) (emphasis added). *See also* Adam Sleeter, *Injecting Fairness into the Doctrine of Forfeiture by Wrongdoing,* 83 Wash. U. Law Quarterly 1367, 1370–71. Thus, the historical rule was limited to where the witness was corruptly and wrongfully kept away, and the rule only allowed former trial evidence between the same parties upon the same issues to be admitted. This case does not involve former testimony at an earlier trial. In *Crawford v. Washington,* 541 U.S. 36, 54 (2004), the court stated that it would recognize "*only those exceptions established at the time of the founding,*" which included the forfeiture doctrine (emphasis added). In *Davis v. Washington,* 547 U.S. ___, 126 S. Ct. 2266, 2280 (2006), the court then discussed, without adopting, the version of the doctrine codified in Federal Rule of Evidence 804(b)(6), which does not limit the doctrine to cases in which testimony was given at an earlier trial. Neither *Crawford* nor *Davis* answered whether the scope of the forfeiture by wrongdoing exception must be limited to that which was recognized at the founding.

¶ 90.　At common law, the forfeiture doctrine was applied in situations where the defendant's wrongful acts were committed with the purpose of preventing a witness from testifying, *see* Hon. Paul W. Grimm and Professor Jerome E. Diese, Jr., *Hearsay, Confrontation, and Forfeiture by Wrongdoing:　Crawford v. Washington, a Reassessment of the Confrontation Clause,* 35 U. Balt. Law Forum 5, 32–33 (2004), and most modern courts have held to this rule. *See e.g. United States v. Houlihan,* 92 F.3d 1271, 1278 (1st Cir. 1996); *United States v. Lentz,* 282 F. Supp. 2d 399, 426 (E.D. Va. 2002). In other words, the forfeiture exception has been applied when an accused has made a witness unavailable, *and when the accused's intent was to deny that witness's presence at the trial.*

¶ 91.　Federal Rule of Evidence 804(b)(4), adopted in 1997, even goes so far as to codify this requirement as an element of the Rule. It states that if the declarant is unavailable as a witness, the hearsay rule does not apply to any "statement offered against a party that has engaged or acquiesced in wrongdoing that *was intended to,* and did, procure the unavailability of the declarant as a witness" (emphasis added). *See, e.g., United States v. Dhinsa,* 243 F.3d 635, 654 (2d Cir. 2001) (requiring that the government prove "the defendant (or party against whom the out-of-court statement is offered) acted with the intent of procuring the declarant's unavailability as an actual or potential witness" for a statement to be admitted under the forfeiture by wrongdoing doctrine) (citations omitted); *State v. Alvarez-Lopez,* 136 N.M. 309, 314 (2005) ("The elements that must be shown for Rule 804(b)(6) to apply are:　(1) the declarant was expected to be a witness; (2) the declarant became unavailable; (3) the defendant's misconduct caused the unavailability of the

declarant; and (4) the defendant intended by his misconduct to prevent the declarant from testifying.") (citations omitted). A defendant that is put on trial for murder cannot be deemed to have killed that person with the intent to deny that person's presence at the witness's own murder trial, unless a preponderance of the evidence establishes that the defendant in fact possessed the intent to keep the witness from testifying.[8]

¶ 92. The majority's discussion of *United States v. Emery,* 186 F.3d 921 (8th Cir. 1999) is illustrative. Majority op., ¶ 44. In *Emery,* the court concluded that the defendant forfeited his right to confrontation where he murdered a federal informant to keep the informant from testifying in another trial. *Id.* at 926. The court declined to accept his argument that the forfeiture doctrine should only be applied where the defendant procured the absence of the witness is the same case the witness was to testify in, as opposed to a subsequent homicide trial. *Id.*

¶ 93. The majority relies on recent cases from other jurisdictions that adopt the broad forfeiture doctrine the majority seeks to employ in this case. Majority op., ¶¶ 45–52. That doctrine is based on a newly created "reflexive forfeiture principle" first advocated by Professor Richard D. Friedman, in *Confrontation and the Definition of Chutzpa,* 31 Israel L. Rev. 506

---

[8] The court in *Davis* took "no position on the standards necessary to demonstrate" forfeiture by wrongdoing, but recognized that federal courts, relying on the Federal Rules of Evidence § 804(b)(6) (codifying the forfeiture doctrine) "have generally held the Government to the preponderance-of-the-evidence standard." *Davis,* 126 S. Ct. at 2280. I accept that, for purposes of this opinion, the majority is not in error in adopting this standard. *See* majority op., ¶ 57.

(1997) (hereinafter *Chutzpa*).[9] By doing so, however, the majority abandons the substantive doctrine that was adopted by the founders in favor of a far more expansive doctrine not contemplated by the founders or by the Sixth Amendment, contrary to Justice Scalia's admonition.[10] *Crawford,* 541 U.S. at 54 (explaining that the right of confrontation under the Sixth Amendment "is most naturally read as a reference to the right of confrontation at common law, *admitting only those exceptions established at the time of the founding*") (citations omitted) (emphasis added). The Sixth Amendment to the United States Constitution does not

---

[9] Professor Friedman recognizes that reflexive application of the forfeiture doctrine is controversial, as well as "quite far-reaching." Richard D. Friedman, *Confrontation and the Definition of Chutzpa,* 31 Israel L. Rev. 506, 508 (1997) (hereinafter *Chutzpa*). The majority declines, however, to adopt Professor Friedman's recommendation that "the court should not hold that the accused has forfeited [the confrontation right] unless the court is persuaded to a rather high degree of probability that the accused has rendered the declarant unavailable[.]" *Id.* at 519.

[10] Professor Friedman's far-reaching approach, if fully embraced by the majority, would clearly lead to nonsensical applications. For example, Friedman suggests that "[t]he prosecution should bear the burden of taking all reasonable steps to protect whatever aspects of confrontation are possible given the defendant's conduct, and of demonstrating that it has done so." *Chutzpa* at 525. Thus, under the reflexive forfeiture principle advocated by Friedman, once Julie left the voicemail to Officer Kosman that indicated that she thought Jensen was trying to kill her, the State had an obligation to notify Jensen that Julie made the statement, and give him an opportunity to cross-examine her by way of videotape or deposition. *Id.* For obvious reasons, the majority does not advance that view. Yet, this is the proper application of Professor Friedman's reflexive forfeiture doctrine adopted by the majority in this case.

state that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [or her], *except in homicide cases.*" While other courts may feel free to disregard the very principles upon which the Confrontation Clause rests, our decision must be limited by the Constitution and the United States Supreme Court decisions interpreting it, i.e., *Reynolds, Crawford* and *Davis.*

¶ 94. In *Crawford,* Justice Scalia wrote that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Crawford,* 541 U.S. at 62. In a similar vein, applying the forfeiture doctrine to admit testimonial evidence when the defendant is on trial for the crime that rendered the witness unavailable, absent any showing that the defendant's purpose was to procure the absence of the witness to keep him or her from testifying at trial, places the cart before the horse.

¶ 95. The circuit court got it right when it noted that the broad forfeiture doctrine advocated by the State, which the majority now adopts, would render superfluous the doctrine of dying declarations. *See generally* Michael J. Polelle, *The Death of Dying Declarations in a Post-Crawford World,* 2006 Mo. L. Rev. 285. The circuit court discerned that both doctrines coexisted at common law at the time the Constitution was ratified. Thus, the circuit court properly reasoned that a current application of the forfeiture doctrine may not do away with the dying declaration doctrine. To quote the circuit judge:

> If an accused forfeits or waives the right of cross-examination merely by killing the victim to "put her out of the way," then there would have been no reason for the development of the Dying Declaration Rule, which

contains the added requirement that the declarant's statement have been made "while believing that the declarant's death was imminent." The existence of the Dying Declaration Rule makes sense only in an evidentiary framework in which the mere fact that the defendant can be convincingly shown to the judge to have killed the declarant does not, by itself, justify exception to the requirements of the Confrontation Clause.

¶ 96. I have no objection to applying the forfeiture doctrine in a criminal trial. That doctrine does not, however, create a homicide exception to the Confrontation Clause. I would not adopt the broad forfeiture doctrine set forth by the majority in this case. I would remand this matter to the circuit court to apply the common law forfeiture doctrine, as it existed at the time that the Constitution was ratified. The majority's broad new rule, I conclude, is unconstitutional.

¶ 97. For the foregoing reasons, I respectfully concur in part and dissent in part.