COURT OF APPEALS
DECISION
DATED AND FILED

March 30, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP344-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2017CF44

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

EDWIN D. HUGHES,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Oneida County: PATRICK F. O'MELIA, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Edwin Hughes appeals from a judgment convicting him of three felonies and from an order denying his postconviction motion.

Hughes challenges the admission at trial of other acts evidence and a recording of a 9-1-1 call, and he claims his trial counsel provided ineffective assistance in several respects. We reject all of Hughes' claims and affirm.

## BACKGROUND

¶2 The State charged Hughes with being party to the crimes of first-degree reckless injury, attempted armed robbery, armed burglary, and operating a motor vehicle without the owner's consent. The charges all arose from a home invasion in which two masked intruders, one white and one black, allegedly pushed their way into a house in Oneida County and demanded money before shooting the homeowner, David Parker,[1] in the legs and driving Parker's car away from the house. During the police investigation, Daniel Frausto admitted to being one of the intruders and named Hughes as his accomplice. Parker died prior to trial, and Frausto became the key prosecution witness. We limit our discussion of the trial evidence to that which is being challenged on appeal or is relevant to our analysis of the challenged evidence.

¶3 Frausto testified that he and Hughes targeted Parker for the burglary because Parker owned a "gentlemen's club" featuring "adult entertainment" and they thought he was likely to have cash in his home. Frausto and Hughes spent about a month before the burglary researching Parker and his residence. Frausto and Hughes wore black "snowmobile garb," including ski masks and gloves, for the burglary so that they could feign needing help to gain entrance to Parker's

---

[1] This matter involves the victim of a crime. Pursuant to WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

house while "blending in." Frausto was armed with a .38 revolver, and Hughes had a 9mm handgun.

¶4 According to Frausto, when Parker opened his door, Frausto and Hughes "flew in" and Frausto hit Parker on the head with a snowmobile helmet. Hughes then forced Parker to the ground, and Frausto threw a blanket over his head. Hughes stayed with Parker asking where "the money was" and for the combination to the safe, while Frausto searched the house for the safe or cash. Parker kept "squirming around," so Hughes pressed his gun against Parker's leg to remind him he was armed. Frausto told Hughes several times to just shoot Parker if Parker kept moving around, in order to scare Parker into compliance. Frausto found a safe, which he threw over an upper-level balcony toward Parker in frustration at being unable to open it and to further intimidate Parker. Before getting the safe open, however, Frausto heard a gunshot.

¶5 Once Frausto saw that Parker had been shot and that the injury could be serious, he decided he and Hughes should "cut [their] losses." Frausto and Hughes left Parker's house and drove Parker's car down the driveway to where they had left their own vehicle, then switched cars. Hughes told Frausto that he had retrieved the shell casing before leaving Parker's house, and he threw it out the car window. Frausto subsequently disassembled Hughes' 9mm and disposed of it in the Fox River.

¶6 Pursuant to a pretrial ruling, Frausto also testified about a series of additional crimes that Frausto claimed to have committed with Hughes and another man, Robert Miles, over a two-year period encompassing the date of the crimes charged here. Frausto said there were a "pretty substantial number" of burglaries and robberies, but he could not say exactly how many. They targeted

the owners of businesses that commonly dealt in cash. Frausto stated that he, Hughes and Miles wore gloves in all of the crimes to conceal their identities and also wore masks during all of the robberies. They typically took cash and any firearms that happened to be in a safe with the cash, but they generally did not take jewelry or personal effects that might be easily identifiable.

¶7    Frausto described three specific prior incidents involving Hughes—one aborted burglary/robbery that occurred in Appleton, one completed burglary/robbery that occurred in Dane County, and one aborted burglary/robbery that occurred in Winnebago County. Each of the residences was targeted because Frausto had reason to believe the homeowner might have substantial amounts of cash—one being a bar/restaurant owner, one having sold two vehicles for cash, and one owning a propane delivery company that accepted cash payments. In the Dane County incident, Hughes "stretched" one of the residents out on the ground at gunpoint while Frausto searched the house for a safe. In the Appleton and Winnebago County incidents, Hughes and Frausto ran off when they encountered someone unexpected. Frausto also mentioned that he "did" two other adult entertainment clubs, which were in his "wheelhouse." Frausto did not specify, however, whether Hughes had participated in those particular robbery/burglaries or whether they targeted the owners' homes or the clubs themselves.

¶8    During Frausto's testimony, the State introduced Exhibit 24 into evidence. The exhibit contained a "synopsis" or "timeline" of twenty-two robbery/burglaries that had occurred in Outagamie, Dane, Calumet, Waupaca, Oneida, Oconto, Fond du Lac, Winnebago and Portage Counties. Ten of the robbery/burglaries were alleged to have been committed by Hughes and Frausto; six were alleged to have been committed by Hughes, Frausto and Miles; one was alleged to have been committed by Hughes and Miles; two were alleged to have

4

been committed by Frausto and Miles; two were alleged to have been committed by Frausto alone; and one was alleged to have been committed by Miles alone. Frausto reviewed the exhibit while he was on the stand and he stated that it was accurate. However, Frausto did not testify about any additional specific robbery/burglaries listed on the exhibit in which Hughes participated—instead confirming that he and Miles had committed a number of robbery/burglaries on the list without Hughes. Exhibit 24 was not published to the jury at the time it was admitted into evidence, and it was not among the documents sent to the jury room during deliberations.

¶9      Miles similarly testified that he had committed an unspecified number of "burglaries" and "property crimes" with Hughes and Frausto, all targeting "homes owned by business owners." They would do research in advance and were looking for older people who had no kids and who owned businesses or had a high income. They "mostly" just took cash and guns and they would normally not take jewelry or electronics. Miles testified specifically about the same aborted Winnebago County robbery that Frausto had described. Miles stated that he had broken a side mirror off the orange Saturn Vue he was driving while making a U-turn near that residence to pick up Hughes and Frausto following their aborted attempt. To Miles' knowledge, Hughes was the only black man who had committed burglaries with Frausto.

¶10     Jack Theyerl, a detective with the Winnebago County Sheriff's Office, testified that he had been personally involved in investigating several home-invasion burglaries in his county, including collecting evidence at the scenes. Theyerl believed the burglaries were linked because they all targeted business owners with cash or safes in their homes, otherwise commonly stolen items such as electronics and jewelry were left behind, and "class match[]" shoe

5

impressions with the same sole patterns were recovered from several scenes. Based on the shoe impressions and unspecified "witness information that was provided," Theyerl further opined that more than one person was involved in the Winnebago County burglaries. During his investigation, Theyerl became aware of crime alerts from other counties involving burglaries with safes that had been cut open. Theyerl also exchanged information with law enforcement in other jurisdictions, including Oneida County, about home invasions targeting business owners.

¶11 Law enforcement eventually traced the mirror from the orange Saturn Vue recovered near the site of the aborted Winnebago County robbery to Miles. That trace led to Miles' apprehension and Miles' subsequent disclosure that Miles, Frausto and Hughes were all involved in the string of home invasions that were being investigated in multiple counties. Once interviewed, Frausto also told law enforcement about his involvement in multiple burglaries and specifically implicated Hughes in the Oneida County robbery/burglary that is the subject of this appeal. Law enforcement then recovered some snowmobile helmets from Frausto's residence—one of which Frausto said was used to strike Parker.

¶12 Pursuant to another pretrial ruling, the State introduced a recording and transcript of a 9-1-1 call made by Parker. On the call, Parker immediately told the dispatcher that "[a] guy just robbed [him] and shot [him] …in the legs" at his house and that he was "bleeding all over the place." After ascertaining Parker's name and address, the dispatcher proceeded to ask a number of questions about what had happened. In response to those questions, Parker stated that he had been shot with a pistol and identified the intruders as two masked males, one black and one white. Parker further described the intruders as "[t]wo taller guys" who were "both about six one" and taller than Parker. Parker said he had opened the door,

not knowing who was there, and had immediately been "smacked" in the face with "[g]uns or something." Parker also told the dispatcher, "Catch these mother fuckers, they're bad." Throughout the call, Parker continued to assert that he was bleeding and asked the dispatcher to "hurry." The dispatcher observed that Parker appeared to have lost consciousness at one point, told him to "[s]tay with me," and reassured him that help was on the way.

¶13    The jury found Hughes guilty of being a party to the lesser-included offense of first-degree reckless injury and the other three offenses charged. Hughes filed a postconviction motion renewing challenges to the circuit court's pretrial rulings on other acts evidence and to the 9-1-1 call as hearsay. Hughes further claimed that his trial counsel provided ineffective assistance by failing to raise a foundation objection to Theyerl's testimony and by failing to request jury instructions related to accomplices and witnesses who had been granted concessions. The court denied the postconviction motion without a hearing, and Hughes now appeals.

## DISCUSSION

¶14    Circuit courts have broad discretion to admit or exclude evidence and to control the order and presentation of evidence at trial. *State v. James*, 2005 WI App 188, ¶8, 285 Wis. 2d 783, 703 N.W.2d 727. We will set aside such discretionary determinations only if the court has failed to apply a relevant statute or consider legally relevant factors, or it has acted based upon mistaken facts or an erroneous view of the law. *Id.*; *Duffy v. Duffy*, 132 Wis. 2d 340, 343, 392 N.W.2d 115 (Ct. App. 1986). Evidentiary rulings that have been previously preserved by objection do not need to be raised in a postconviction motion.

WIS. STAT. § 974.02(2); *see also* **State v. Hayes**, 167 Wis. 2d 423, 425-26, 481 N.W.2d 699 (Ct. App. 1992).

¶15    To obtain a hearing on a postconviction motion, a defendant must allege material facts sufficient to warrant the relief sought. **State v. Allen**, 2004 WI 106, ¶¶9, 36, 274 Wis. 2d 568, 682 N.W.2d 433.  No hearing is required, though, when the defendant presents only conclusory allegations or when the record conclusively demonstrates that he or she is not entitled to relief. **Nelson v. State**, 54 Wis. 2d 489, 497-98, 195 N.W.2d 629 (1972).

## 1.  Other Acts Evidence

¶16    Hughes first contends the testimony of Frausto and Theyerl about the series of home invasions was impermissible other acts evidence.  As a general matter, evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." WIS. STAT. § 904.04(2)(a).  Nonetheless, other acts evidence may be admitted to show some "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." **Id.**  Other acts evidence may also be admitted to provide context or a complete explanation of the crime, or to bolster the credibility of a witness. **State v. Hunt**, 2003 WI 81, ¶¶58-59, 263 Wis. 2d 1, 666 N.W.2d 771.

¶17    Other acts evidence offered for a permissible purpose still must be relevant under WIS. STAT. §§ 904.01 and 904.02, in that such evidence relates to a fact or proposition of consequence to the determination of the action, and its probative value must not be substantially outweighed by the danger of unfair prejudice or confusion of issues under WIS. STAT. § 904.03. **State v. Sullivan**, 216 Wis. 2d 768, 785-89, 576 N.W.2d 30 (1998).  Establishing a distinct

modus operandi is particularly probative of intent, plan or identity. *State v. Hurley*, 2015 WI 35, ¶¶64-65, 361 Wis. 2d 529, 861 N.W.2d 174.

¶18 Here, Hughes does not allege that the circuit court failed to reasonably apply the *Sullivan* test to the facts of record in its pretrial ruling. He further acknowledges that Frausto's and Miles' testimony about the aborted burglary/robberies in Appleton and Winnebago County and the completed burglary/robbery in Dane County "at least arguably" demonstrated a similarity to the burglary of Parker's home in this case. Hughes argues, however, that Frausto's testimony about other offenses listed on Exhibit 24 and Theyerl's testimony about crimes being investigated in the Fox Valley area "was extremely general in nature and did not tend to show anything but that Hughes was a serial property offender." We disagree.

¶19 The testimony of both Frausto and Theyerl described specific similarities between the current offenses and all of the Fox Valley burglaries Theyerl had been investigating to which Frausto admitted involvement. In particular, both men testified that all of the burglaries targeted the homes of business owners likely to have substantial amounts of cash on hand, and did not involve the theft of commonly stolen items such as jewelry or electronics. Frausto provided additional details about how he, Hughes and Miles planned the robberies in advance and executed them while armed and wearing masks and gloves. This was classic modus operandi evidence that was highly probative of Hughes' identity as one of the two masked intruders in Parker's house. In addition, testimony about the entire investigation and the aborted Winnebago County burglary provided context to explain how the police eventually linked Hughes to the Parker home invasion. As the circuit court noted, the danger of unfair prejudice was limited because property crimes do not typically "invoke the kind of

sympathies or horror" that often accompany a homicide or sexual assault crime. We conclude the court did not erroneously exercise its discretion in admitting any of the other acts evidence.

## 2. 9-1-1 Call

¶20    Hughes next contends the 9-1-1 call should have been excluded as hearsay. Hearsay is defined as an out-of-court statement—that is, an oral or written assertion or nonverbal conduct intended as an assertion—offered in evidence "to prove the truth of the matter asserted," other than a prior inconsistent statement by a witness or an admission by a party opponent. WIS. STAT. § 908.01. Hearsay is generally not admissible unless it falls within one of the statutory exceptions set forth in WIS. STAT. ch. 908. WIS. STAT. § 908.02. Moreover, even statements that would otherwise fall within exceptions to the hearsay rule may need to be excluded pursuant to the Confrontation Clause of the Sixth Amendment if they were testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 67-68 (2004) (testimonial statements from absent witnesses can be admitted only when witness is unavailable and defendant had prior opportunity to cross-examine, regardless of other indicia of reliability). A statement is testimonial in nature when "a reasonable person in the position of the declarant would objectively foresee that [the] statement might be used in the investigation or prosecution of a crime." *State v. Jensen*, 2007 WI 26, ¶25, 299 Wis. 2d 267, 727 N.W.2d 518 (citation omitted), *superseded on other grounds by Giles v. California*, 554 U.S. 353, 360-65 (2008) (addressing forfeiture by wrongdoing).

¶21    The State argues that the 9-1-1 call was admissible as an excited utterance under WIS. STAT. § 908.03(2), or as "a statement of recent perception under … § 908.03(1)." The latter contention conflates the exceptions for a present

sense impression under § 908.03(1) and a statement of recent perception under WIS. STAT. § 908.045(2). Because the circuit court admitted the 9-1-1 call under the excited utterance and present sense impression exceptions, we need not address whether the call might also have been admitted as a statement of recent perception.

¶22 A statement is admissible as an excited utterance, regardless of the availability of the declarant, if it relates to a startling occurrence and was made while the defendant was under the stress of excitement caused by the event. WIS. STAT. § 908.03(2); *see also State v. Huntington*, 216 Wis. 2d 671, 681-82, 575 N.W.2d 268 (1998) (spontaneity and stress endow statements with sufficient trustworthiness to be admissible). A statement is admissible as a "present sense impression," regardless of the availability of the declarant, when it "describe[s] or explain[s] an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Sec. 908.03(1); *see also State v. Ballos*, 230 Wis. 2d 495, 505, 602 N.W.2d 117 (Ct. App. 1999) (statements made in 9-1-1 calls by witnesses to a fire qualified as both present sense impressions and excited utterances).

¶23 Hughes acknowledges that Parker's initial comments about his injuries and needing help "might be" excited utterances. He contends that Parker's additional statements identifying the type of firearm with which he had been shot and the race and size of the perpetrators do not qualify for the excited utterance exception because they were made "at the instigation of a law enforcement dispatcher" and "in anticipation of further litigation." However, unlike statements of recent impression admissible pursuant to WIS. STAT. § 908.045(2), there is no statutory requirement that excited utterances cannot be made in response to the "instigation" of an investigator or in anticipation of

11

litigation. Forcing entry into Parker's home, holding Parker on the ground with his head covered while demanding the location of a safe or money, and shooting Parker were all startling occurrences. Statements in the immediate aftermath of those events describing the gun used and the race and size of the home invaders directly relate to those startling occurrences. Parker continued to be under the stress of excitement caused by these events throughout the 9-1-1 call as he was bleeding profusely and drifting in and out of consciousness. The fact that Parker was still bleeding during the 9-1-1 call also shows that his statements describing the gun used to shoot him and the race and size of the home invaders were made "immediately [after]" he perceived them. We therefore conclude that all of Parker's statements on the 9-1-1 call qualified both as excited utterances and present sense impressions.

¶24 We next consider whether Parker's statements on the 9-1-1 call, although qualifying as statutory exceptions to the hearsay rule, must nevertheless be excluded on constitutional grounds. Hughes asserts that the admission of the 9-1-1 call violated his right to confront witnesses because the hearsay exception for statements of recent perception is not "firmly rooted in constitutional jurisprudence." We once again emphasize that the circuit court did not admit the 9-1-1 call as a statement of recent perception; it admitted it as an excited utterance and present sense impression.

¶25 Hughes also argues that Parker's statements were testimonial in nature because he made them "in anticipation of further litigation that would ensue when the perpetrators were caught and charged." Hughes asserts that Parker would be an "interested party" to any criminal prosecution because it might result in a restitution award. We do not agree that Parker's statements on the 9-1-1 call were made in anticipation of litigation. They were made in the context of

obtaining help for potentially life threatening injuries. While the dispatcher might have had a dual motivation in keeping Parker talking and obtaining investigatory information, a reasonable person in Parker's position would not be focused on a potential subsequent trial while his life was in immediate danger. We conclude there was no Confrontation Clause violation because the statements were not testimonial in nature.

### 3. Ineffective Assistance of Counsel

¶26 Hughes contends that his trial counsel provided ineffective assistance by failing to raise an objection to Theyerl's testimony for lack of personal knowledge and by failing to request jury instructions related to accomplices and witnesses who have been granted concessions. Because the circuit court denied Hughes' postconviction motion without holding an evidentiary hearing, we review the ineffective assistance claims in the context of determining whether the facts alleged in the postconviction motion would, if true, establish both that counsel provided deficient performance and that the defendant was prejudiced by that performance. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. We need not address both elements of the ineffective assistance test if the defendant fails to make a sufficient showing on one of them. *Id.* Here, we conclude Hughes has failed to establish deficient performance.

¶27 In order to demonstrate deficient performance, a defendant must overcome a presumption that counsel's actions fell within a wide range of professional conduct. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Here, the record shows that Hughes' trial counsel objected to Theyerl's testimony that he believed more than one person was involved in the Winnebago County burglaries

13

for "lack of foundation." The circuit court overruled the objection, stating that Theyerl could answer if he had an opinion "after his investigation." The court's decision was supported by Theyerl's testimony that he had been personally involved in the investigation of the Winnebago County burglaries. It would be reasonable for an attorney to assume that the court's foundation ruling applied to Theyerl's entire line of testimony about what he learned during his investigation. It was not deficient performance for Hughes' trial counsel to fail to raise additional foundation objections to each question Theyerl answered about the investigation.

¶28 Finally, Hughes contends his trial counsel should have requested jury instructions on testimony by accomplices and by witnesses who have been granted concessions. We conclude neither instruction was warranted. Criminal Jury Instruction 245 cautions the jury against relying upon the uncorroborated testimony of an accomplice. WIS JI—CRIMINAL 245 (2000). Frausto's testimony was not uncorroborated, however. The 9-1-1 call corroborated that two men, one black and one white, had broken into Parker's home and shot him in the legs. A bullet recovered from Parker's house corroborated that Hughes had used a 9mm gun. Miles corroborated that Hughes had participated with Frausto in a series of robberies and burglaries. Theyerl corroborated that Frausto had been caught as a result of the mirror broken off of the getaway car linked to Miles during the aborted Winnebago County robbery. The snowmobile helmet recovered from Frausto's residence corroborated his testimony that he had struck Parker with a snowmobile helmet. When an accomplice's testimony is at least partially corroborated, a standard witness credibility instruction is sufficient. *Linse v. State*, 93 Wis. 2d 163, 168, 286 N.W.2d 554 (1980). Criminal Jury Instruction 246 cautions the jury about relying upon the testimony of a witness who has been

offered concessions. WIS JI—CRIMINAL 246 (2000). Here, conversely, Frausto did not receive anything in exchange for his testimony against Hughes.

¶29 In sum, the record conclusively demonstrates that counsel did not perform deficiently by failing to request either jury instruction. Therefore, the circuit court did not err in denying Hughes' postconviction motion without a hearing.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.